COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| ENES KANLIC, M.D., | | No. 08-09-00235-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 120th District Court |
| | § | |
| SHIRLEY MEYER, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 2006-3642) |
| | § | |

**O P I N I O N**

Enes Kanlic, M.D. appeals from an order denying his motion to dismiss this medical malpractice action pursuant to Section 74.351(b) of the Civil Practice and Remedies Code. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

Shirley Meyer filed this lawsuit alleging malpractice arising from Dr. Kanlic's treatment of various medical conditions related to her right hip. According to the pleadings and the expert report, Meyer suffered a comminuted right pelvis/acetabulum fracture which was treated with an open reduction internal fixation on May 24, 2000. In June 2000, Dr. Kanlic diagnosed Meyer as having a failure of the internal fixation, a dislocation of her right hip, and an infection in the fracture region of her right pelvis. Meyer underwent several operations to treat the persistent infection and she suffered several dislocations of the hip in 2000 and 2001. In October 2001, Dr. Kanlic performed a right total hip arthroplasty. Meyer suffered several additional hip dislocations between 2001 and August 2004. In August 2004, Meyer saw Dr. Kanlic following the most recent dislocation. He reviewed x-rays made on the date of her visit but did not note any infection or loosening of the hip.

Meyer consulted Dr. Eric Sides the following day and he concluded--after reviewing the x-rays-- that she had a loose acetabular component with loose plate and screws and a persistent fracture. He also determined that the loose acetabular cup accounted for the dislocations and he believed that she had a comminuted fracture of the acetabulum which had never healed. Dr. Sides also found that Meyer's hip was infected.[1] Meyer subsequently underwent treatment for infection in the hip and had revision hip arthroplasty.

In her petition, Meyer complained that Dr. Kanlic (1) failed to adequately and properly diagnose and treat her following her initial surgery for hip fractures; (2) failed to provide necessary follow-up review and treatment; and (3) failed to adequately treat the complications which developed following surgery. In accordance with Section 74.351 of the Civil Practice and Remedies Code,[2] she provided an expert report prepared by Theodore W. Crofford, M.D. Dr. Kanlic objected to the report and filed a motion to dismiss, alleging that the report did not set forth the applicable standard of care and did not state the manner in which the care rendered by him failed to meet that standard. He also argued that Dr. Crofford failed to conclude that the treatment rendered by Dr. Kanlic was a proximate cause of Meyer's injuries or damages. The trial court found the report inadequate but granted Meyer's request for a thirty-day extension pursuant to Section 74.351(c). After Meyer submitted a revised expert report prepared by Dr. Crofford, Dr. Kanlic filed written objections and another motion to dismiss. The trial court overruled the objections and denied the motion to dismiss. This appeal follows.

## ADEQUACY OF THE EXPERT REPORT

In his sole issue for review, Dr. Kanlic challenges the sufficiency of the revised expert report.

---

[1] According to the pleadings, Meyer's hip was infected with Pseudomonas aeruginosa.

[2] TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(Vernon Supp. 2009).

He contends that it inadequately addressed the applicable standard of care, what conduct of his breached it, and how that breach caused injury.

*Statutory Requirements*

In a healthcare liability claim, a claimant is required to serve on each party an expert report no later than 120 days after the original petition is filed. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a)(Vernon Supp. 2009). Section 74.351(r)(6) defines "expert report" as a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(6). A defendant may file a motion challenging the adequacy of the report. TEX.CIV.PRAC.& REM.CODE ANN. § 74.351(*l*). The trial court is required to grant the motion only if it finds, after a hearing, that the report does not represent an objective good faith effort to comply with Section 74.351(r)(6)'s definition of an expert report. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(*l*). To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001).

The trial court should look no further than the report itself because all the information relevant to the inquiry is contained within the four corners of the document. *Bowie Memorial Hospital*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. The report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three statutory elements:

standard of care, breach, and causal relationship. *Bowie Memorial Hospital*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. A report cannot merely state the expert's conclusions; it must explain the basis of the expert's statements to link the conclusions to the facts. *Bowie Memorial Hospital*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879.

*Standard of Review*

We review a trial court's order either dismissing or refusing to dismiss a medical malpractice claim for an abuse of discretion. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Palacios*, 46 S.W.3d at 877. An abuse of discretion occurs when a trial court acts arbitrarily or unreasonably and without reference to any guiding rules or principles. *Walker*, 111 S.W.3d at 62.

*Standard of Care and Breach Thereof*

Dr. Kanlic suggests that the revised expert report failed to identify the applicable standard of care or how he breached it. We agree that the report does not precisely identify the standard of care using legal terminology, but Dr. Crofford clearly opined that the standard of care required a physician who specializes in hip replacement surgery to evaluate radiographs of a patient's hip and identify looseness of the acetabular component, malpositioning of the hip, and infection. With respect to the breach element, the report recounted that "Dr. Kanlic made an incorrect diagnosis in July 2004 when he stated that there were no problems or no loosening of the total hip." Thus, the report identified the specific conduct Meyer has called into question, i.e., the doctor's failure to diagnose and treat the conditions causing instability in her hip, and it provided a basis for the trial court to conclude that the claim has merit.

Dr. Kanlic additionally argues that Dr. Crofford relied upon the opinion of Dr. Sides but failed to append either Dr. Sides' qualifications or opinions. Citing *Jones v. King*, Dr. Kanlic maintains that Dr. Sides' input cannot be used to cure deficiencies in Dr. Crofford's report. *Jones*

*v. King*, 255 S.W.3d 156, 160 (Tex.App.--San Antonio 2008, pet. denied). In *Jones*, the expert "relied heavily" on an opinion and documentation by another doctor that failure to turn off a morphine pump caused diabetes insipidus. *Id.* The court of appeals noted that the other doctor's qualifications were not established in the expert report and the documentation was not attached. *Id.* Given that the sufficiency of a report must be judged solely by its four corners, the court of appeals held that the missing documentation could not cure its deficiencies. *Id.* Here, Dr. Crofford stated his agreement with Dr. Sides but he did not rely on Dr. Sides' opinion or documentation to establish any of the statutory elements. Instead, the report indicated Dr. Crofford formed his own opinion – based upon his examination of the radiographs – that the acetabular component was loose.

*Causation*

We turn now to Dr. Kanlic's primary assertion that the expert report is inadequate because it failed to explain how a breach of the standard of care caused Meyer's injuries. An expert report should explain how the defendant's action or inaction caused injury. *Bowie Memorial Hospital*, 79 S.W.3d at 53. We are not permitted to fill in the gaps of an expert report by drawing inferences or guessing as to what the expert likely meant or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex.App.--Austin 2007, no pet.). Nor may we infer causation. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex.App.--El Paso 2008, no pet.).

After stating his qualifications and Meyer's medical history relating to her hip arthroplasty, Dr. Crofford opined:

> Following her right hip arthroplasty, Ms. Meyer, unfortunately, suffered several dislocations of her hip. In July of 2004, she saw Dr. Kanlic after dislocation of her hip, which I believe was the last issue treated by Dr. Kanlic for Ms. Meyer. In August of 2004, Dr. Kanlic saw her in his office and gave her hip position precautions and told her to go home and be careful with the position of her hip. Dr. Kanlic noted in x-rays from August 25, 2004 that there were no significant problems or loosening of her hip. He made no mention of infection of her right hip when he

saw her in August of 2004.

Ms. Meyer then went on to be seen by Dr. Sides on August 25, 2004 who felt, just one day after the visit by Dr. Kanlic,[3] that she had a loose acetabular component with loose plate and screws and that the stem of the femur 'did not appear to be involved.' According to the records, Dr. Sides apparently continued to provide follow-up treatment and evaluation of Ms. Meyer and expressed some disagreement with the diagnosis and treatment determined by Dr. Kanlic. Ultimately, Ms. Meyer was referred to see me in November of 2004.

My treatment of Ms. Meyer included debridement of her hip and treatment for an infection. She was subsequently referred to my partner, Dr. Steve Weeden, for revision hip arthroplasty of this complex situation. She has apparently undergone revision of her hip arthroplasty, but I have no records regarding this procedure in my possession.

I think that Dr. Kanlic made an incorrect diagnosis in July of 2004 when he stated that there were no problems or no loosening of the total hip. I agree with Dr. Sides that the x-rays from that time demonstrate that the acetabular component was loose. Additionally, with Ms. Meyer's history of infection, the possible diagnosis of recurrent infection certainly should have been entertained by Dr. Kanlic. The malposition of the hip and the loosening of the acetabular component together with the presence of infection in the right hip created the specter of continued and recurrent instability in the hip, with resultant persistent pain from recurrent dislocations. Although the evaluation of radiographs following hip arthroplasty sometimes is difficult, I think that if Dr. Kanlic specializes in hip replacement surgery the standard of care would dictate that such a trained physician should be expected to recognize this problem. That failure to meet this standard of care caused a delay in the diagnosis of the aforementioned malpositioning, loosening, and infection. This delay lead [sic] to a period of recurrent hip instability and hip pain until the problems were diagnosed and treated.

While the failure to accurately diagnose and treat Ms. Meyer's hip caused her to suffer continued instability and pain until the condition was corrected to prevent recurrent dislocations, I cannot state that the delay in diagnosis from the time she was seen by Dr. Kanlic in August of 2004 until she present to me in November of 2004 substantially changed her ultimate treatment or the outcome of her hip replacement surgery. Ms. Meyer had a complex problem with deficiencies of bone stock, particularly in the acetabulum. I do not think that recurrent dislocations or a several week delay of the diagnosis of an infection substantially altered the eventual course of Ms. Meyer's treatment or eventual outcome. This delay, however, did result in a period of continued instability and hip pain until the conditions were treated.

---

[3] The report is unclear whether Meyer saw Dr. Kanlic on August 24 or 25. It is clear that she consulted with Dr. Sides on August 25.

Dr. Kanlic focuses on August 25, 2004, the day he noted in x-rays that there were no significant problems or loosening of the hip. Meyer saw Dr. Sides either the same day or the next day. From this, Dr. Kanlic concludes that there was no delay in treatment, there was no pain associated with any delay in treatment, and thus there is no causal connection. He faults Dr. Crofford's report because the only breach articulated is the failure to properly read the x-rays and x-rays cannot show infection.

In support of this argument, Dr. Kanlic directs to our decision in *Castillo v. August*, 248 S.W.3d 874 (Tex.App.--El Paso 2008, no pet.). There, the plaintiff underwent spinal surgery and was subsequently transferred to a rehabilitation facility under the care of Dr. August. The plaintiff developed a staph infection in the surgical site and meningitis. She sued Dr. August and other defendants alleging that Dr. August had a duty to "observe and monitor" her incision for any sign of infection and that his failure to do so resulted in the staph infection and life-threatening meningitis. The expert report opined that the standard of care required Dr. August to personally and vigilantly monitor the plaintiff's status because she had presented upon admission with signs and symptoms of infection. The standard of care also required that he identify, examine, diagnose, and take measures to treat the infection. *Id.* at 882. The trial court denied Dr. August's motion to dismiss because the report did not adequately delineate either the standard of care or how a breach thereof harmed the plaintiff. *Id.* at 878. Noting that causation could not be inferred, we concluded that the report did not adequately address causation because it did not explain how the staff infection caused the meningitis. *Id.* at 882-83.

Dr. Kanlic also relies on the San Antonio Court of Appeals' opinion in *Jones v. King*, 255 S.W.3d 156 (Tex.App.--San Antonio 2008, pet. denied). The plaintiff sought treatment for chronic pain from an anesthesiologist who recommended the implantation of an intrathecal morphine pump.

The plaintiff later filed suit claiming she developed meningitis, diabetes insipidus, and other health problems as a result of complications from the surgical implantation of the morphine pump and subsequent treatment. The court of appeals determined that the expert report offered a series of conclusory statements that (1) the morphine pump should never have been placed and its placement proximately caused all of the injuries and damages alleged by the plaintiff, (2) the failure to timely detect the meningitis and treat it for more than forty-eight hours caused it to become worse and resulted in numerous additional complications and injuries including decreased vision, diabetes insipidus, and pain, and (3) the failure to turn off the morphine pump when the catheter was removed caused diabetes insipidus. *Id.* at 159. The report thus failed to adequately address causation because it offered no medical explanation about whether earlier treatment would have been effective in shortening the duration of the meningitis. *Id.* at 159-60. The report was also deficient despite the expert's opinion that the continued morphine flow caused the hypothalamus "to go to sleep" resulting in diabetes insipidus because it did not explain how the continued morphine flow caused the hypothalamus "to go to sleep" or how a "sleeping" hypothalamus could cause diabetes insipidus. *Id.* at 160-61.

Dr. Crofford's report stated that Dr. Kanlic failed to correctly diagnose and treat malpositioning of the hip, looseness in the acetabular component, and infection in Meyer's hip, which caused her to suffer continued instability and pain until the condition was corrected. We agree that the report does not explain how Dr. Kanlic's failure to diagnose the infection caused instability in the hip. Nor does the report advise that surgery was delayed three months because of the untreated infection. Of course, we are prohibited from filling in these analytical gaps or stacking these inferences. But in contrast to the expert reports in *Castillo* and *Jones*, Dr. Crofford did explain how Dr. Kanlic's misdiagnosis of looseness in the acetabular component and malpositioning of the hip

and his failure to treat the condition caused Meyer to suffer from continued instability and hip pain until the condition was surgically corrected.  Likewise, his report stated that Dr. Kanlic's failure to diagnose the hip infection caused her to suffer pain until the infection was treated.  We conclude that the report sufficiently establishes how Dr. Kanlic's action caused Meyer's injury.  We overrule the sole issue and affirm the trial court's order denying Dr. Kanlic's motion to dismiss.

June 23, 2010

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.