

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TENET HOSPITALS, LTD. A TEXAS LIMITED PARTNERSHIP, D/B/A PROVIDENCE MEMORIAL HOSPITAL, | § § § | |
| | § | No. 08-14-00087-CV |
| Appellant, | § | Appeal from the |
| v. | § | 327th Judicial District Court |
| | § | of El Paso County, Texas |
| ESPERANZA NARAH GARCIA, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ARMANDO GARCIA AND FOR ALL WRONGFUL DEATH BENEFICIARIES, INCLUDING MINOR ALEXA GARCIA, | § § | (TC# 2013DCV2809) |
| | § | |
| Appellee. | § | |
| | § | |

## **O P I N I O N**

This is a health care liability case.  The issue in this interlocutory appeal is the adequacy of the expert report filed by the Garcias, who sued Tenet Hospitals, Ltd. d/b/a Providence Memorial Hospital (Providence) and others over the death of Armando Garcia.  The trial court denied Providence's challenge to the preliminary expert report served by the Garcias.  We conclude the trial court did not abuse its discretion and affirm.

**BACKGROUND**

We take the following background information from the petition and the expert report in issue, noting that the factual claims have not yet been proven.

**July 22, 2011**

Armando Garcia, who was 46 at the time, saw his family practitioner the morning of July 22, 2011. He complained of shortness of breath, chest pain, and nausea. His electrocardiogram (ECG) was abnormal. Garcia was given aspirin and oxygen, and sent by ambulance to the emergency room at Providence, arriving at the ER just before noon.

Garcia continued to complain of shortness of breath and chest pain at the ER. Another ECG was abnormal. Garcia reported having chest pain the day before while walking at work, and earlier that day while climbing stairs. His chest pain was alleviated by rest and aggravated by exertion. The ER doctor ordered oxygen, IV fluids, pain medication, and the anti-coagulant Lovenox.

Garcia was admitted to the hospital under the care of a family practice/hospitalist at 1:05 p.m. that day. At 2:27 p.m., Dr. Roger Belbel, a cardiologist, was asked to consult on the case given Garcia's complaints of chest pain. Dr. Belbel gave telephone orders for a two dimensional echocardiogram and asked that Garcia be scheduled for a stress test with contrast material in the morning.

Neither Dr. Belbel nor the admitting doctor saw Garcia on the 22nd. Instead, a nurse practitioner working for the admitting doctor saw Garcia at 3:45 p.m. that day. The nurse practitioner's notes reflect that the echocardiogram had been completed by that time, but made no comments concerning the results. Garcia was assessed with atypical chest pain and having a high risk for cardiovascular disease, based on his morbid obesity, hypertension, and diabetes.

**July 23, 2011**

Dr. Belbel did see Garcia sometime before 8:50 a.m. on the morning of the 23rd. Garcia was anxious and felt pressure in his chest, but no more chest pain. He had been up and walking the hospital floor. He reported having almost passed out from walking a few days before. Dr. Belbel noted it was unclear whether a cardiac or a pulmonary issue was causing Garcia's chest pain and shortness of breath. The doctor noted the need for a CT scan to rule out a pulmonary embolism, and that he would need to review the results of the echocardiogram he had ordered the day before.[1] His new orders included a request for a CT scan to rule out a pulmonary embolism, and a consult with a pulmonologist.

Garcia was taken for his stress test at around 9 a.m. The test involved the injection of a contrast material, which was given at 9:19 a.m. At some point during the test, Garcia went into respiratory arrest. A rapid response team was called at 10:58 a.m. Despite their efforts, Garcia expired and was pronounced dead at 11:26 a.m.

A later autopsy determined Garcia died from "bilateral pulmonary thromboembolism with pulmonary infarction." The lungs had a well formed clot in the main pulmonary artery. There were also multiple clots in the small and medium-sized pulmonary blood vessels, all of which led to an "80% hemorrghic [sic] infarction of the pulmonary parenchyma[.]" His cardiac arteries showed only minimal changes.

Several of the physicians made chart entries *after* Mr. Garcia died. Dr. Belbel is reported to have written:

---

[1] It is unclear why the results of the echocardiogram were not in the medical chart by that time, or if they were, why Dr. Belbel had not reviewed the chart before or while he saw Garcia. The medical chart is not a part of our record. Most of the chronological information about these events comes from a medical summary attached to the expert's report, which at times paraphrases, and at times quotes, segments of the medical record.

> I had just finished reviewing his echo doppler this morning shortly after the IV lexi dose had been given and that [sic] I noted some alarming findings in the study that suggested he may have already presented to the emergency room and to his physician with a pulmonary embolism rather than a coronary ischemic problem as had been suggested by the Nurse Practitioner that had seen him yesterday as well as his primary physician who referred him to the ER, and by the ER physician that had seen him in the ER and had neglected to obtain a CT scan with contract [sic] in the ER to exclude the diagnosis of pulmonary embolism and aortic dissection, as well as a calcium coronary score ...[.]

The admitting doctor made a chart entry a week following the death suggesting Mr. Garcia may have arrested due to possible allergic reaction to contrast material injected during the stress test.

### The Expert Reports

The Garcias filed health care liability claims against Providence, the ER physician, the admitting physician, and the nurse practitioner. They did not sue Dr. Belbel. As provided by statute, they were required to serve a complying preliminary expert report. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351 (West Supp. 2014). The report here was authored by Thomas DeBauche, MD, a practicing cardiologist who is board certified in internal medicine. Providence has not raised any issue concerning his qualifications.

Dr. DeBauche's initial report reflects he reviewed Garcia's medical records from the primary care physician and Providence, an outline of the medical care (attached to his report), and the autopsy report. Dr. DeBauche concluded the emergency room physician, the admitting physician, the nurse practitioner, as well as Providence breached the applicable standards of care which led to Garcia's death. We focus only on the allegations against Providence.

The report contends a patient presenting with a history of fainting, shortness of breath, and atypical chest pain must be evaluated to "rule out [the] triple threat," which includes the three major risks facing such a patient – pulmonary embolism, aortic dissection, and myocardial infarction (heart attack). From the record we gather that pulmonary embolism describes a blood

4

clot(s) collecting in the lungs that can potentially diminish or cut off a person's oxygen intake. Dr. DeBauche describes pulmonary embolism as a threat as serious as the cardiac conditions.

Dr. DeBauche makes two allegations against Providence. First, Garcia was given a two dimensional echocardiogram on July 22. The echocardiogram showed a TrVelocity of 321.67 cm/s and estimated right ventricle systolic pressure of 56.82mm Hg. Dr. DeBauche describes these numbers as "very abnormal" with one being twice the normal value. A chart note by Dr. Belbel, made after Mr. Garcia passed away, referred to the findings as "alarming." Dr. DeBauche concludes the echocardiogram technician, whom we presume to be an employee or agent of Providence, had a duty to report these findings immediately to Dr. Belbel. Dr. DeBauche further claims that had Dr. Belbel been alerted to these findings, he would have ordered a CT scan with contrast, which takes about 15 minutes, and which would have definitively diagnosed the pulmonary embolism.

Dr. DeBauche also faults the emergency room nurses for failing to tell Dr. Belbel when they called to arrange the consult on July 22 that Garcia had shortness of breath and was obese (he weighed some 350 pounds). He believes that had Dr. Belbel known of Garcia's shortness of breath and body weight, he would have also ordered the CT scan and discovered the pulmonary embolism earlier.

As to causation, Dr. DeBauche summarily concluded that Dr. Belbel would have ordered a CT scan. "This would have diagnosed PE and prevented Mr. Garcia's death." Providence challenged this report on several grounds. Relevant here, it contended the causation opinion was conclusory. Providence also contended that Dr. DeBauche's theory concerning what Dr. Belbel would have done had he been provided different information was nothing more than speculation and conjecture.

5

The Garcias responded to this challenge by serving, within the time limit for their original report, an "addendum report" authored by Dr. DeBauche. That addendum states: "I have read the Affidavit of Dr. Roger Belbel dated 11/11/13, which substantiates the statements and opinions made in my letter to you dated 10/14/13. I agree with Dr. Belbel's statement that treatment with anticoagulant and thrombolytic medications on 7/22/11 would have prevented Mr. Garcia's death on 7/23/11." Simultaneously, the Garcias filed and served an affidavit from Dr. Belbel, which in substance states that had he been told on July 22 that Garcia was short of breath and obese, he would have ordered a CT scan at that time. He also would have ordered a CT scan if he had been told of the abnormal echocardiogram results. Pulmonary embolism is diagnosed by a chest CT scan. Dr. Belbel concludes that: "[i]f PE had been diagnosed on 7/22/11 (via CT scan), then Armando Garcia would have been treated by me that night with stat anticoagulant and thrombolytic medications (including TPA, heparin) to dissolve the pulmonary embolism. In my opinion, as a cardiologist who has treated multiple patients with PE, in reasonable medical probability, such treatment for the PE on 7/22/11 would have prevented Mr. Garcia's death on 7/23/11." Dr. Belbel's curriculum vitae was attached to his affidavit.

Providence renewed its challenge to this combination of reports. The trial court heard and rejected its challenge.

## STANDARD OF REVIEW

We begin with the familiar standards governing expert medical reports in health care liability claims. The statute requires that within 120 days after a defendant health care provider files an answer, the plaintiff must serve an "expert report" as to that provider. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a).[2] An "expert report" is statutorily defined to mean

---

[2] The prior version of the statute in effect when this suit was filed required the report to be served within 120 days of filing the suit. Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex.Gen.Laws 847, 875, amended by

6

one that "provides a fair summary of the expert's opinions" regarding the standard of care, how the health care provider failed to meet that standard, and as relevant here, "the causal relationship between that failure and the injury, harm, or damages claimed." *Id*. at § 74.351(r)(6). An expert report that does not represent a good faith effort to comply with the statute is inadequate, and a trial court must grant a motion challenging an inadequate report. *Id*. at § 74.351(*l*).

The phrase "fair summary of the expert's opinions" means at least that the expert must state more than a mere conclusion. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878-79 (Tex. 2001). Instead, the expert must explain the basis of the opinion so as to link the conclusion to the facts of the case. *Bowie Memorial Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). While the claimant need not marshal all of the evidence to support the opinion, there must be sufficient facts to meet the two objectives of the statute: to inform the defendant of the specific conduct claimed to be negligent and to satisfy the trial court that the claims have merit. *Palacios*, 46 S.W.3d at 877. The trial court should not have to fill in missing gaps in a report by drawing inferences or resorting to guess work. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Kanlic v. Meyer*, 320 S.W.3d 419, 422 (Tex.App. – El Paso 2010, pet. denied).

The trial court makes the decision whether the report is sufficient. Our role, whether the trial court has approved or rejected the report, is to determine if the trial court abused its discretion. *Tenet Hospitals Ltd. v. Boada*, 304 S.W.3d 528, 533 (Tex.App. – El Paso 2009, pet. denied). A trial abuses its discretion when it acts arbitrarily or unreasonably and without reference to any guiding rules or principles. *Id*.

**DISCUSSION**

---

Act of June 17, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex.Gen.Laws 1590. The change is of no consequence to the issues before us.

Providence brings two issues on appeal. In Issue One it asks whether it was proper for the trial to court to credit Dr. Debauche's adoption of Dr. Belbel's affidavit given that Dr. Belbel: (a) only makes self-serving statements; (b) is a potentially responsible party; and (c) is not himself offered as a qualifying expert. In Issue Two Providence asks if the causation opinion, which assumes that an earlier communication of Garcia's condition to Dr. Belbel would have resulted in a different treatment regime, is adequately linked to the facts of the case. Providence weaves into its discussion of these issues various arguments concerning how the report fails to meet several requisites of Rules 702 and 703 of the Texas Rules of Evidence.[3]

### The Expert's Reliance on Dr. Belbel's Affidavit

As we understand its contention, Providence objects to Dr. DeBauche adopting Dr. Belbel's reasoning and opinions. Its objection is not based on the simple mechanics of Dr. DeBauche adopting by reference another physician's opinion, but rather it is primarily focused on adopting another physician's opinion without any analysis or indicia of reliability.[4]

---

[3] In this opinion, we will refer to the restyled versions of Rules 702 and 703, which became effective April 1, 2015. *See* Tex. Sup. Ct. Misc. Dkt. No. 15-9048 (March 10, 2015), at 41. We note that the "restyling changes are intended to be stylistic only." *Id*. at 1.

TEX.R.EVID. 702. Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX.R.EVID. 703. Bases of an Expert's Opinion Testimony

An expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

[4] *Palacios* held that in determining the adequacy of a report, the court should look only to the four corners of the report itself. 46 S.W.3d at 878. Nonetheless, preliminary experts can adopt the opinions of other preliminary experts or other qualified physicians as a part of their report. *Tenet Hosp. Ltd. v. Barajas*, 451 S.W.3d 535, 548 (Tex.App. – El Paso 2014, no pet.)(preliminary expert adopting causation opinion from treating doctor that fall at hospital caused knee injury); *Kelly v. Rendon*, 255 S.W.3d 665, 676 (Tex.App. – Houston [14th Dist.] 2008, no pet.)(one preliminary expert adopting other preliminary expert's opinion).

An initial premise for much of Providence's argument is represented by the statement in its reply brief that "[t]he statute requires Dr. DeBauche's causation testimony to comply with the rules of evidence generally applicable to expert opinion testimony."[5] For this proposition, Providence relies on TEX.CIV.PRAC.&REM.CODE ANN. §§ 74.351(r)(5)(c) and 74.403, as well as *Collini v. Pustejovsky*, 280 S.W.3d 456 (Tex.App. – Fort Worth 2009, no pet.). Because this proposition is a linchpin for much of Providence's argument, we begin here.

*Which rules of evidence apply to preliminary expert
medical reports in health care liability claims?*

An "expert" is a defined term in health care liability claims, and the expert must possess certain statutorily designated qualifications. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5). Specifically, an expert providing a causation opinion must be a "physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *Id.* at § 74.351(r)(5)(C).[6] From this reference to the Texas Rules of Evidence, Providence argues that a host of relevance and reliability limitations apply to expert causation opinions. For instance, it contends the limitation in TEX.R.EVID. 703 concerning what an expert may rely on applies to preliminary expert reports in health care liability claims.

But we think this goes too far. Section 74.351(r)(5)(C) incorporates the rules of evidence in the context of the expert's qualifications, not the substance of the opinion itself. Certainly TEX.R.EVID. 702's requirement that the witness must be qualified by "knowledge, skill, experience, training, or education" would apply. But we think it premature at this early stage of a case to impose all of the additional requirements in Rules 702 and 703 concerning relevance and reliability. We take the language in Section 74.351(r)(5)(C) at face value that the reference

---

[5] Similar statements appear at eight other places in Providence's briefing to this Court.

[6] Section 74.403 sets out additional qualifications such as licensure and active practice that are not in issue here.

to the Texas Rules of Evidence pertains to qualifications, and not to the opinion itself. Otherwise, every report challenge would turn into a mini-*Daubert Robinson* hearing.[7]

Providence also relies on *Collini v. Pustejovsky*, 280 S.W.3d 456 (Tex.App. – Fort Worth 2009, no pet.), to argue that Rule 703 and the reliability tests in *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713 (Tex. 1998), apply at the expert report stage of a health care liability claim. *Collini* involved a treating doctor who allegedly overprescribed and under monitored the drug Reglan, which caused permanent injury to her patient. *Id*. at 459-60. The patient filed an expert report from a board certified family practice doctor supporting the claim. *Id*. The expert had some background in pharmacology, but otherwise presented no credentials on any specific expertise with the drug Reglan. *Id*. at 465. The expert attempted to incorporate the opinions of several treating doctors whose qualifications were not disclosed. *Id.* at 466. The court held the expert failed to demonstrate any specific qualifications with regard to Reglan, and while noting that it would be appropriate for one physician to rely on the opinions of others, there was nothing in the record about the qualifications of the other physicians upon whom he relied. *Id*. In supporting its conclusion that the particular expert was not qualified on causation issues, the *Collini* court cites TEX.R.EVID. 703 and its reasonable reliance requirement, as well as the reliability requirements explained in *Gammill* and *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). *Collini*, 280 S.W.3d at 465-66. Providence uses these citations in *Collini* as a springboard to launch many of its arguments.

*Collini*, however, is factually distinguishable if for no other reason than Dr. Belbel's qualifications are included as a part of his affidavit.[8] Thus the situation here is unlike *Collini*

---

[7] *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex. 1995); *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

where there was no evidence of the other doctors' qualifications other than the MD designations behind their names. Additionally, Providence does not challenge either Dr. DeBauche or Dr. Belbel's qualifications in this appeal. We understand its challenge to be focused on the reliability of the opinion itself. Finally, to the extent *Collini* stands for the proposition that the full panoply of the Rule 702 and 703 relevance and reliability standards apply to a preliminary expert report in a health care liability claim, we would simply disagree.

No doubt, TEX.R.EVID. 702 generally requires that an expert's opinion must be both relevant and reliable. *Gammill* and *Tamez*, both cited by *Collini*, base this requirement on *Robinson*. *Gammill*, 972 S.W.2d at 720; *Tamez*, 206 S.W.3d at 578. In turn, *Robinson* discerns the relevance and reliability requirement from the "assistance" clause in Rule 702 that provides "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact…" a suitably qualified witness can express an expert opinion. 923 S.W.2d at 556. We read Section 74.351(r)(5)(C), however, as primarily grafting the "qualifications" clause of Rule 702 onto the inquiry ("[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education…"). Because *Robinson* and its progeny spring out of the "assistance" clause of Rule 702, they are less a part of the inquiry at this preliminary stage of the litigation.[9]

---

[8] Dr. Belbel's curriculum vitae reflects that he is board certified in internal medicine, cardiovascular medicine, and interventional cardiovascular medicine. He was the chief of cardiology services at William Beaumont Army Medical Center and Las Palmas Medical Center. Relevant here, he has written on the issue of pulmonary embolisms. Nina J. Karlin MD, Roger J. Belbel MD, James P. Bradley MD, *Acute Pulmonary Distress Syndrome due to Massive Pulmonary Embolism*, 91 Southern Medical Journal, No. 10, 998 (Oct. 1998).

[9] *Gammill* also addressed whether the experts were qualified to express the opinions they did under Rule 702. 972 S.W.2d at 719. Accordingly, the *Gammill* opinion would be instructive here if the issue before us was the qualifications for either Dr. DeBauche or Dr. Belbel. *See Padilla v. Loweree*, 354 S.W.3d 856, 863 Tex.App. – El Paso 2011, pet. denied)(applying *Gammill* in expert qualification issue); *Palafox v. Silvey*, 247 S.W.3d 310, 316 (Tex.App. – El Paso 2007, no pet.)(same).

We emphasize that all of the Rule 702 and 703 requirements will fully apply to these opinions at other stages of the case, such as summary judgment and trial.[10] A trial court has an obligation to insure that only relevant and reliable expert opinions are admitted into evidence. *Robinson*, 923 S.W.2d at 556. But, that inquiry requires a fully developed record, where the trial court can consider published literature, other expert opinions, and the like. *See Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex. 1997)(court should evaluate underlying data to determine if the opinion itself is reliable); *Constancio v. Shannon Medical Ctr.*, No. 03–10–00134–CV, 2012 WL 1948345, at *13 (Tex.App. – Austin May 22, 2012, no pet.)(expert challenge in medical malpractice case where testimony from opposing expert and medical literature was considered); *Taber v. Roush*, 316 S.W.3d 139, 152-59 (Tex.App. – Houston [14th Dist.] 2010, no pet.)(reviewing trial court's decision to admit expert's brachial plexus opinion in light of other expert opinions, literature in field, and decisions of other courts). Because the Texas Supreme Court has limited the preliminary expert report inquiry to the four corners of the report itself,[11] it is inappropriate at this early stage to attempt to apply *Robinson* and its progeny to the process.

We also emphasize that the trial court still needs enough information from the expert report to verify that the claim has merit. *Palacios*, 46 S.W.3d at 877. This level of proof is certainly more than an expert's *ipse dixit* or bald conclusions. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012)(report cannot be based only on assumed facts pleaded in case); *Palacios,* 46 S.W.3d at 879 (opinion must be more than mere conclusions). But it is something

---

[10] Several cases which Providence relies on in its Reply Brief, such as *Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 382 (Tex.App. – Fort Worth 2003, pet. denied), and *Hall v. Rutherford*, 911 S.W.2d 422, 426 (Tex.App. – San Antonio 1995, writ denied), address what experts might properly rely on at the summary judgment stage of a case. In *Fraud-Tech*, for instance, an expert's reliance on the *ipse dixit* of another expert's was held improper under "rule 702, *Robinson*, and its progeny." 102 S.W.3d at 382. We do not believe all of those inquiries are appropriate at this stage of the case.

[11] *Palacios*, 46 S.W.3d at 878.

12

less than the plaintiff will need to show at a *Daubert/Robinson* challenge to the expert. With regard to causation, it should certainly include an articulable, complete, and plausible explanation of how the alleged breaches led to the damages sustained. If the plaintiff gets their foot that far inside the door, they can then proceed with discovery to verify that the plausible explanation can be proven by a preponderance of the evidence.

*Did the trial court abuse its discretion in crediting*
*Dr. DeBauche's reliance on Dr. Belbel's affidavit?*

Our view of Section 74.351(r)(5)(C) answers most of Providence's claims. As a part of its first issue, Providence challenges Dr. Debauche's reliance on Dr. Belbel's affidavit. It criticizes Dr. Belbel's affidavit on a number of levels: it is "self-serving"; Dr. Belbel's actual actions belie what he claims in the affidavit; Dr. Belbel might be at fault because other defendants below have attempted to designate him as a responsible third party; Dr. Belbel's statements about what he would have done are inherently subjective, and could never be tested. Providence's precise legal argument is that Dr. DeBauche can only rely on materials regularly relied on by an expert, and no expert would rely on these kind of self-serving or questionable claims made by the treating physician. It argues that Dr. DeBauche could not have reasonably relied on Dr. Belbel's assertions, as a matter of law.

We reject this argument for a number of reasons. First and foremost, the requirement concerning what an expert can rely on is found in TEX.R.EVID. 703, and we find no basis to impose that requirement upon a preliminary expert report in a health care liability claim. Many of the reliability measures that Providence raises also flow out of the "assistance" clause of Rule 702, and we find no basis to apply them at this juncture. We acknowledge the case law holding that if the preliminary expert relies on some other physician's opinion, there must be some indication of that other physician's qualification to express the opinion relied upon. *Collini*, 280

13

S.W.3d at 466; *Jones v. King*, 255 S.W.3d 156, 160 (Tex.App. – San Antonio 2008, pet. denied). We don't disagree with that logic, but note that qualification is not an issue here as Dr. Belbel's affidavit suggests he is qualified, and Providence has not challenged those qualifications. Rather, its challenges focus on the reliability of Dr. Belbel's statements under a number of different legal principles that have limited application here.

Providence cites a number of cases for the proposition that statements in an affidavit must be "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and readily controvertible[.]" *E.g.*, *Brown v. Mesa Distribs.,* 414 S.W.3d 279, 287 (Tex.App. – Houston [1st Dist.] 2013, no pet.); *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex.App. – Houston [1st Dist.] 1997, no pet.). It claims Dr. Belbel's affidavit fails many of these requirements. But these are summary judgment cases. *Brown*, 414 S.W.3d at 287; *Rizkallah*, 952 S.W.2d at 584. *Palacios* specifically instructs that the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." 46 S.W.3d at 879.

Closely aligned to this argument, Providence claims the statements by Dr. Belbel are inherently subjective, and could never be tested for their truth. And indeed, in the summary judgment context, a claim by an interested witness that cannot be readily controverted will not support summary judgment in some types of cases. *E.g.*, *Garcia v. C.F. Jordan, Inc.*, 881 S.W.2d 155, 158 (Tex.App. – El Paso 1994, no writ)(defendant in conspiracy case could not support summary judgment on interested witness's affidavit denying existence of conspiracy). But it turns the logic of this rule on its head to say that because Dr. Belbel's statements are subjective that the Garcias can never get their case into discovery and before a jury. We agree that Dr. Belbel's assertions are subjective in the sense that he is hypothecating what he would

14

have done with the benefit of hindsight. But there is always a level of subjectivity with witnesses recounting what they might have done were the situation different. The veracity of those claims is for the fact finder to decide.[12]

Nor is Dr. Belbel's self-interest a basis for discounting his assertions as a matter of law. At some level, every entry made in a medical record is motivated by self-interest. A nurse makes accurate chart entries to better serve their patient, but also because hospital policy likely requires it--if the nurse failed in this duty he or she would soon be out of a job. A doctor makes chart entries to better serve their patient but also in part out of self-protection if questions later arise. A patient discloses their symptoms in the hopes this will assist in their cure. Some self-interest may be more apparent, as with chart entries after a patient's untoward outcome, but we doubt the courts could articulate a standard that a trial court could apply to cull out some self-interested statements from others. Ultimately, that seems a function for a jury.

Providence also contends that Dr. DeBauche could not have relied on Dr. Belbel's affidavit because the actual events belie what he claims in the affidavit. According to Providence, Dr. Belbel was aware that the results of the echocardiogram were available on the morning of the 23rd, but he decided to proceed with the stress test before having a CT scan rule out a pulmonary embolism. We have carefully reviewed the record and find the time line of events the morning of the 23rd ambiguous at best. Dr. Belbel dictated his chart note at 8:50 a.m. suggesting that he saw the patient sometime before then. He states that he would review the echocardiogram that morning, suggesting he had not yet seen it. A later note states he saw the echocardiogram after the contrast material for the stress test had already been administered, suggesting the test had already started. The summary of the medical chart does not affirmatively

---

[12] We also note that at some point Dr. Belbel's statements can be tested both against his actions on the morning of the 23rd and any literature that sets out accepted algorithms for treating a patient such as Mr. Garcia.

indicate Dr. Belbel consciously decided to proceed with the stress test before having a CT scan done. In any event, the question is what Dr. Belbel would have done if the CT scan had been done the day before. These facts may all be relevant for the fact finder's determination, but they hardly require the trial court to discount Dr. Belbel's assertions as a matter of law.

Finally, we could speculate on why the Garcias did not sue Dr. Belbel, or why he has not been added as a third-party defendant, but whether he is a party does not dictate as a matter of law whether his statements carry any credence. The medical chart is no doubt full of statements that will be attributed to Mr. Garcia, the ER doctor, the admitting physician, and the nurse practitioner, all of whom are already parties to the underlying case. If an expert is not required to ignore these chart entries, we see no reason the expert would be required to ignore the assertions of a potential party (or potential responsible third party).

In sum, we conclude the trial court did not abuse its discretion in crediting Dr. DeBauche's reliance on Dr. Belbel's affidavit. We overrule Issue One.

### Adequacy of Causation Opinion

In Issue Two, Providence contends Dr. DeBauche's causation opinion is not adequately tied to the facts of this case. A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that absent that act or omission, the harm would not have occurred. *Clapp v. Perez*, 394 S.W.3d 254, 261 (Tex.App. – El Paso 2012, no pet.); *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 249 (Tex.App. – San Antonio 2004, no pet.). An expert report must provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury. *Bowie Memorial Hospital,* 79 S.W.3d at 53. The court should not have to fill in missing gaps by drawing inferences or guessing as to what the expert likely meant or intended. *See Bowie Mem'l Hosp.*,

16

79 S.W.3d at 52; *Kanlic*, 320 S.W.3d at 422.  Nor may we infer causation.  *Castillo v. August*, 248 S.W.3d 874, 883 (Tex.App. – El Paso 2008, no pet.).

It is clear an expert report that speaks only of possibilities will not suffice to meet this standard.  *Bowie Memorial Hospital*, 79 S.W.3d at 53 (expert's opinion that plaintiffs "would have had the possibility of a better outcome" did not meet standard); *Hutchinson v. Montemayor*, 144 S.W.3d 614, 617 (Tex.App. – San Antonio 2004, no pet.)(expert claim that if arteriogram had been done, there was a "possibility" of a correctable lesion such that an amputation may have been avoided).  Nor would a causation opinion that contains an obvious gap in the chain of causation meet the statute's requirements.  *Bowie Memorial Hosp.*, 79 S.W.3d at 53 (failure to explain how not reading x-rays led to injury); *Tenet Hospitals, Ltd. v. Love*, 347 S.W.3d 743, 755 (Tex.App. – El Paso 2011, no pet.)(claim that hospital's failure to provide on-call pulmonologist caused death without explanation of how that might have altered course of treatment); *Estorque v. Schafer*, 302 S.W.3d 19, 28 (Tex.App. – Fort Worth 2009, no pet.)(failure to explain how consult with urologist would have changed outcome);  *Costello*, 141 S.W.3d at 249 (expert's claim that better monitoring of cardiac patient would have prevented heart attack failed to explain how result would be different).  In this sense at least, *Gammill*'s "analytical gap" phraseology is descriptive of the problems with the reports in *Bowie*, *Love*, *Schafer*, and *Costello*.  In each of those cases a link in the chain of causation was completely missing.

But, beyond these rather clear landmarks, the waters become a bit murkier.  Providence relies on a number of cases finding causation opinions inadequate because they raised more questions than they answered.  One such case is *Jones v. King*, 255 S.W.3d 156 (Tex.App. – San Antonio 2008, pet. denied), a case involving the implant of a morphine pump.  The plaintiff claimed to have contracted meningitis and diabetes from the implantation, and sued in part over a

48-hour delay in diagnosing the meningitis. *Id*. at 158-59. The preliminary expert report contended the 48-hour delay caused the plaintiff additional pain and suffering, and made the eventual treatment of the meningitis more difficult. *Id*. The majority opinion in *Jones* held the report was inadequate because it left too many unanswered questions, such as the normal and expected treatment course for meningitis, and what happens if there is a delay. *Id*. at 160 (noting lack of a "baseline" to tell if condition actually got worse).

Another illustrative case is *Kapoor v. Klovenski*, No. 14-11-00118-CV, 2012 WL 8017139 (Tex.App. – Houston [14th Dist.] Feb. 16, 2012, no pet.). *Kapoor* is a failure-to-diagnose-case in which the treating doctor allegedly caused a three-month delay in diagnosing a cancer. *Id*. at *1. By the time the cancer was diagnosed, it was too late to treat. *Id*. at *3. The first expert report filed by the plaintiff's expert only generally discussed the importance of early diagnoses and treatment, and summarily concluded that an earlier diagnoses probably would have avoided the patient's death. *Id*. at *2. In the first appeal, the court of appeals found this opinion conclusory, and remanded the case for the trial court to consider an extension to remedy the deficiency. *Id*. On remand, the expert issued a new report that specifically identified the particular cancer at issue, and noted it was small with no signs metastasis at the point it should have been diagnosed. *Id*. at *3. When it was eventually diagnosed, it had grown to a size with a zero percent chance of survival. *Id*. The survival rate for a much smaller tumor was as high as 60%. *Id*. at *9. In a second appeal, the court found this second report adequate in the sense that the trial court did not abuse its discretion in accepting it. *Id*. at *10.

Conversely, the Garcias rely on two decisions that approved expert causation opinions arguably less detailed than the one here. In *Manor Care Health Services, Inc. v. Ragan*, 187 S.W.3d 556 (Tex.App. – Houston [14th Dist.] 2006, pet. granted, judgm't vacated w.r.m.) the

18

plaintiff claimed that the nursing staff failed to administer anti-coagulation drugs that later resulted in the patient having a pulmonary emboli and cardiac arrest. *Id*. at 564. The expert merely stated that the failure to continue the anti-coagulation treatment "contributed" to the pulmonary embolus and that had it continued, the patient in all probability would not have had the cardiac arrest. *Id*. The trial court did not abuse its discretion in finding this causation opinion sufficient. *Id*.

The Garcias also rely on this Court's opinion in *Bustillos v. Rowley*, 225 S.W.3d 122 (Tex.App. – El Paso 2005, pet. denied). In that case, a patient with pulmonary edema (fluid in the lungs) went to the emergency room at 11:30 p.m. and by 3:42 a.m. she arrested and then died less than two hours later. *Id*. at 125, 129. The experts claimed that the ER physician did not monitor the patient with a pulse oxymeter or cardiac monitor, and had that been done, the "appropriate treatment" could have been initiated and prevented the cardio-vascular collapse. *Id*. at 130. This Court held that the causation opinion, while "not eloquently stated," was adequate under the statute. *Id*. at 131.

Ultimately, we resolve this issue based on what was before the trial court. The trial court had before it not only Dr. Belbel's statement that he has successfully treated patients with pulmonary embolisms before, but also the precise manner in which he claimed that he could have prevented the clot from killing Mr. Garcia. Dr. Belbel describes the use of two specific drugs to dissolve the clots which had formed in Garcia's lungs. The trial court also had Dr. DeBauche's statement that he agreed that this specific regime of anticoagulant and thrombolytic medications if initiated on July 22 would have prevented the death on July 23. Each link in the chain of causation was described: reporting the echocardiogram findings to Dr. Belbel would lead to a CT scan on the 22nd; the CT scan would have demonstrated a pulmonary embolism;

19

Dr. Belbel would then initiate stat administration of heparin and TPA; administration of these drugs dissolves or reduces the size of the clot(s); reduced or dissolved clot avoids respiratory arrest. Whether the Garcias can prove each of these links by a preponderance of the evidence is yet to be seen, but they are described sufficiently to get them to the starting line in the litigation.

Providence also argues the causation theory here is an impermissible "chain of speculations" ("*if* the correct diagnostic test had been run, then the correct diagnosis *could* have been reached…"). But at some level, every negligence case is built on some assessment of what the actors would have done but for the negligent act. *If* the nurse made an accurate sponge count, *then* the surgeon would not have closed the wound until every sponge was found. Only when the chain becomes too attenuated can a court, as a matter of law, decide the cause-in-fact issue. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794 (Tex. 2004)(health care providers who negligently released patient were not liable for subsequent traffic accident caused by patient); *Givens v. M&S Imaging Partners, L.P*., 200 S.W.3d 735 (Tex.App. – Texarkana 2006, no pet.)(negligence in giving pregnant mother's ultrasound was too attenuated from infant's hypoxia occurring months later). The record and the briefing do not raise this question.

Related to its attack on the causation chain, Providence faults Dr. DeBauche's report for not ruling out other possible causes for Garcia's death. We agree that ruling out other causes in the causation equation will be relevant in subsequent proceedings. *Jelinek v. Casas,* 328 S.W.3d 526, 536 (Tex. 2010)(in review of jury verdict, holding that "when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion."). But at the preliminary

20

expert report stage, this Court has recently held that ruling out other causes is premature, in part because of the limited available discovery. *Tenet Hosp. Ltd. v. Barajas*, 451 S.W.3d 535, 549 (Tex.App. – El Paso 2014, no pet.).

In sum, we conclude the expert's causation opinion is adequate. Issue Two is overruled.

## CONCLUSION

We are unable to conclude the trial court abused its discretion in refusing to dismiss the suit against Providence based on its arguments raised under Issues One and Two. Accordingly, we affirm.

STEVEN L. HUGHES, Justice

April 22, 2015

Before Rodriguez, J., Hughes, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), sitting by assignment