

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| EL PASO SPECIALTY HOSPITAL LTD., | § | |
| Appellant, | § | No. 08-15-00282-CV |
| v. | § | Appeal from the |
| MARIA GURROLA, INDIVIDUALLY AND ON BEHALF OF ALL | § | 448th District Court |
| WRONGFUL DEATH BENEFICIARIES, AND AS REPRESENTATIVE OF THE | § | of El Paso County, Texas |
| ESTATE OF OSCAR GURROLA, DECEASED, | § | (TC# 2014DCV3560) |
| | § | |
| Appellee. | | |

## O P I N I O N

This is a healthcare liability case subject to the Texas Medical Liability Act. TEX.CIV.PRAC.&REM.CODE CH. 74 (West 2011). On November 9, 2012, Mr. Oscar Gurrola underwent a non-surgical manipulation of his shoulder which was performed under anesthesia at El Paso Specialty Hospital, was discharged, suffered cardiac arrest, and died. His wife, Maria Gurrola, sued El Paso Specialty Hospital, Dr. Scott A. Protzman, El Paso Orthopaedic Surgery Group, and Nurse Anesthetist Fred Utter, CRNA.[1] Maria timely served Dr. Michael Koumjian's expert reports on the defendants. The trial court heard the defendants' objections to the expert

---

[1] The other defendants challenge the trial court's overruling of their objections to the expert's reports in a separate appeal. *See Scott A. Protzman, M.D., El Paso Orthopaedic Surgery Grp., P.A., and Fred Utter, CRNA v. Maria Gurrola, Indiv. & On Behalf of all Wrongful Death Beneficiaries, & as Representative of the Estate of Oscar Gurrola, Deceased,* No. 08-15-00281-CV.

reports and motion to dismiss Maria's suit. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(b)(West Supp. 2015).

In this interlocutory appeal the Hospital asks us to determine whether the trial court abused its discretion when it overruled the Hospital's objections to Dr. Koumjian's expert report and denied its motion to dismiss. TEX.CIV.PRAC.&REM.CODE ANN. § 51.014(a)(9)(West Supp. 2015). The Hospital identifies two issues for resolution. In Issue One, the Hospital asserts Dr. Koumjian's expert report is inadequate because it is conclusory and fails to satisfy the statutory requirements for establishing causation. In Issue Two, the Hospital asserts Dr. Koumjian's expert report and *curriculum vitae* fail to establish his qualifications to render expert opinions regarding the standard of care applicable to post-operative care for orthopaedic procedures and causation, such that the trial court was left to impermissibly infer whether Dr. Koumjian was qualified to render his opinion. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(B), (C)(West Supp. 2015); TEX.CIV.PRAC.&REM.CODE ANN. § 74.402 (West 2011).

We conclude the trial court did not abuse its discretion in overruling the Hospital's objections and denying its motion to dismiss Dr. Koumjian's expert report regarding the Hospital's conduct, and affirm the trial court's ruling.

**BACKGROUND**

The basis of Maria's claim, and the focus of Dr. Koumjian's report, involves Oscar's post-procedure tachycardia as well as the acts or omissions of the Hospital's employees or agents in relation thereto, specifically with regard to the failure to monitor, diagnose, care for and treat the condition. Maria alleges that while Oscar was under the care of the defendants, he developed

2

symptoms of congestive heart failure but was discharged home where he suffered a cardiac arrest, was cared for by emergency personnel, and transported to another medical facility where he was pronounced dead. An autopsy revealed that Oscar died from severe coronary atherosclerosis.

## DISCUSSION
### *Standard of Review*

We review the trial court's ruling on the adequacy of an expert's report for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex. 2001); *Tenet Hospitals Ltd. v. Boada*, 304 S.W.3d 528, 533 (Tex.App.--El Paso 2009, pet. denied). Under an abuse of discretion standard, the appellate court defers to the trial court's factual determinations if they are supported by evidence, but reviews the trial court's legal determinations de novo. *See Stockton v. Offenbach,* 336 S.W.3d 610, 615 (Tex. 2011)(citing *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 643 (Tex. 2009)). A trial court abuses its discretion if it rules without reference to guiding rules or principles. *Samlowski v. Wooten,* 332 S.W.3d 404, 410 (Tex. 2011).

## I. Expert Qualifications

We first address Issue Two, in which the Hospital asserts Dr. Koumjian is not qualified to render expert opinions. To opine on whether a health care provider other than a physician has departed from accepted standards of health care, the Healthcare Liability Act requires that an expert must be a person who:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

3

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(b); TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(B). To opine on causation in any healthcare liability claim, an expert must be a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(C).

An expert report or its required accompanying *curriculum vitae* must show that the expert is qualified to opine on the subject matter at issue. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a); *In re McAllen Med. Center, Inc.*, 275 S.W.3d 458, 463 (Tex. 2008). The medical expert need not practice in the same specialty as the defendant in order to qualify as an expert. *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003). However, not every licensed physician is always qualified to testify on every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996).

To determine whether an expert report is sufficient to demonstrate the qualifications of the expert to opine, the trial court should focus on the medical expert's "knowledge, skill, experience, training, or education" concerning the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.2d at 153-54 (applying Texas Rule of Evidence 702); *see also Tenet Hospitals, Ltd. v. Garcia*, 462 S.W.3d 299, 306 (Tex.App.--El Paso 2015, no pet.)(application of rules of evidence in assessing expert's qualifications to opine on causation as set forth in Section 74.351(r)(5)(C) pertains only to expert's qualifications and does not extend to expert's opinion). The focus of the trial court should not be

4

on the specialty of the medical expert. *Roberts*, 111 S.W.3d at 122. A medical expert from one specialty may be qualified to testify if he has practical knowledge of what is traditionally done by medical experts of a different specialty under circumstances similar to those at issue in the case. *Pediatrix Med. Services Inc. v. De La O*, 368 S.W.3d 34, 40 (Tex.App.--El Paso 2012, no pet.). If the subject matter is common to and equally recognized and developed in all fields of practice, any practitioner familiar with the subject may testify as to the standard of care. *Id*. at 40. The trial court must ascertain that the expert does indeed possess the expertise on the subject for which he is giving an expert opinion. *Palafox v. Silvey*, 247 S.W.3d 310, 316 (Tex.App.--El Paso 2007, no pet.). The proffered medical expert's qualifications must be evident from the four corners of his expert report and *curriculum vitae*. *See Palacios*, 46 S.W.3d at 878. We cannot infer causation either by filling in missing gaps or by guessing what an expert likely meant or intended. *Tenet Hosps. Ltd. v. Bernal*, 482 S.W.3d 165, 171 (Tex.App.--El Paso 2015, no pet.); *Tenet Hosps, Ltd. v. Garcia,* 462 S.W.3d 299, 310 (Tex.App.--El Paso 2015, no pet.)(citing *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002)).

*Dr. Koumjian's Qualifications*

We first address Issue Two in which the Hospital challenges Dr. Koumjian's qualifications to provide an expert opinion in this case. The Hospital first asserts that Maria's complaint in the trial court is limited to Oscar's post-operative care after the performance of an outpatient shoulder manipulation, and argues that Dr. Koumjian has failed to establish within his report and curriculum vitae that he is qualified to render expert opinions regarding the standard of post-procedure care for this type of outpatient procedure. The Hospital suggests that Dr. Koumjian's expert report and *curriculum vitae* leave us to impermissibly infer his familiarity

5

with non-cardiovascular, orthopaedic procedures.

We disagree with these assertions. In her petition, Maria asserts that: (1) the Hospital knew or should have known that Oscar was at risk for "developing a cardiac arrest because of severe coronary disease;" (2) while Oscar was at the Hospital, the standard of care included proper assessment and treatment to prevent a patient like Oscar from "developing a cardiac arrest because of severe coronary artery disease;" (3) the Hospital violated the standard of care by failing to provide proper assessment and treatment to prevent Oscar's cardiac arrest and death; and (4) at all relevant times, the Hospital acted by and through its employees and agents and are vicariously liable for their negligent acts and omissions.[2] There is no question that Maria's complaint addresses Oscar's status as an at-risk cardiac patient, and challenges the Hospital's compliance with the proper standard of care to be provided him as an at-risk cardiac patient. Therefore, pursuant to Section 74.351(r)(5)(B), Dr. Koumjian must establish that he is qualified under the requirements of Section 74.402(b) to testify as an expert witness on the issue of whether the defendant health care provider departed from accepted standards of care. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(B); TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(b).

*Applicable Law*

In a suit involving a health care liability claim against a health care provider, a person may

---

[2] Although for simplicity we address Appellant Hospital as the health care provider, we analyze the sufficiency of the expert report only with respect to the actions of the Hospital's employees and agents in Maria's vicarious liability claim. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 626 (Tex. 2013)(defendant did not challenge adequacy of expert report as to its vicarious liability); *TTHR Ltd. Partnership v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013)(expert report is analyzed as to physician's actions, and plaintiff's claims that hospital was vicariously liable for the physician's actions may proceed if expert report regarding physician's actions adequately address the standard of care, breach, and causation as to physician); *see also Tenet Hosp. Ltd. v. Bernal*, 482 S.W.3d 165, 174 (Tex.App.--El Paso 2015, no pet.)(expert must consider both the pleadings and the medical record in formulating opinion, but is not required to address hospital's vicarious liability for physician's acts or omissions in order for expert's report to be adequate)(citing *Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012)).

6

qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition *involved in the claim*; and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.   [Emphasis added].

TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(b).   "Practicing health care" includes:   (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider. TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(a).

In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:   (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim.   TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(c).   In determining whether an expert is qualified to offer expert testimony on the issue of whether the defendant health care provider departed from accepted standards of medical care, the court shall apply the criteria specified in Subsections (a), (b), and (c) but may depart from those criteria if,

7

under the circumstances, the court determines that there is a good reason to admit the expert's testimony.  TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(d).  If it departs from the specified criteria, the court shall state on the record its reason for admitting the testimony.  *Id.*

*Analysis*
*Qualifications to Opine on Standard of Care and Causation*

Maria filed Dr. Koumjian's expert report regarding the Hospital as well as his *curriculum vitae.*  Dr. Koumjian's *curriculum vitae* indicates that he has been licensed to practice medicine since 1978, is currently the Chief of Surgery at Sharp Grossmont Hospital, has appointments as attending staff, consulting staff, provisional staff, or transitional staff in cardiothoracic surgery at seven hospital facilities, is board certified in Thoracic Surgery, and also conducts a private practice in cardiovascular and thoracic surgery.  Thus, he was licensed and practicing medicine as a cardiovascular and thoracic surgeon and as Chief of Surgery at the time of his expert report and at the time Maria's claim arose.  He has previously served as Chief of the Cardio-Thoracic Section of Scripps Mercy Hospital, and has served as a District Counselor for the American College of Cardiologists.  Dr. Koumjian has completed residencies in general surgery and cardiothoracic surgery, as well as fellowships involving cardiac surgery, cardiac transplantation, and cardiac "valve."  He has lectured on the intra-operative use of inotrophic agents during and immediately post-cardiopulmonary bypass, and has served as an assistant clinical professor of surgery for the University of California at San Diego's Department of Cardiac Surgery.

In his expert report, Dr. Koumjian states his medical practice involves the diagnosis and treatment of coronary artery disease under the same or similar circumstances here, and Dr. Koumjian states he is familiar with the standard of care concerning the evaluation of both the risk and prevention of death caused by severe coronary atherosclerosis under the same or similar

8

circumstances in this case. He is also familiar with the evaluation, consultation, diagnosis, and treatment of patients who are at risk for death caused by atherosclerosis. Dr. Koumjian consults and works with other health care providers concerning patients who are at risk and have symptoms associated with severe coronary artery disease, and is familiar with the standard of care for the evaluation, consultation, diagnosis, and treatment of patients who are at risk for death caused by severe coronary atherosclerosis. He works closely with nurses who evaluate at-risk patients who have symptoms associated with severe coronary artery disease under the same or similar circumstances presented in this case, and is familiar with the nursing standard of care for reporting to physicians the symptoms associated with coronary artery disease under the same or similar circumstances as presented in this case, the diagnosis, care, or treatment of which is involved in Maria's claim.

Dr. Koumjian has demonstrated that at the time his testimony was given, he was practicing healthcare in a field of practice that involves the same type of care or treatment as that delivered by the defendant healthcare provider, if the provider is an individual, or was practicing that type of health care at the time the claim arose. TEX.CIV.PRAC.&REM.CODE ANN. §§ 74.351(r)(5)(B); TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(a), (c). He has sufficiently demonstrated that he has knowledge of the accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in Maria's claim, and is qualified on the basis of training or experience to offer an expert opinion regarding the accepted standards of medical care. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(B); TEX.CIV.PRAC.&REM.CODE ANN. § 74.402(b)(2), (3).

*Qualifications to Opine on Causation*

9

The Hospital also complains that Dr. Koumjian has failed to sufficiently demonstrate that he is qualified to render an expert opinion on the causal nexus of Oscar's death, asserts that he has failed to mention that he possesses any causation expertise, and specifically complains that he fails to discuss "post-operative" care for shoulder manipulation, noting that Dr. Koumjian's report speaks in terms of the applicable standards of care without specific reference to his "causation expertise." That Dr. Koumjian's expert report speaks in terms of standard of care but does not specifically speak in terms of causation does not necessarily render his report deficient in demonstrating his qualifications to opine on causation. Moreover, as we have noted, Maria's petition challenges the adequacy of care administered to Oscar as an at-risk cardiac patient. We will therefore address whether Dr. Koumjian has demonstrated his qualifications to opine on causation in that regard.

To opine on causation in any healthcare liability claim, an expert must be a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(5)(C); TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(a). Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact issue. *See* TEX.R.EVID. 702. Section 74.351(r)(5)(C) incorporates the rules of evidence in the context of the expert's qualifications, not the substance of the opinion itself. *Garcia*, 462 S.W.3d at 306. Consequently, Rule 702's requirement that the witness must be qualified by "knowledge, skill, experience, training, or education" applies here. *Id.*

10

That an expert is qualified to opine on the subject matter at issue may be shown in the expert's report or its required accompanying *curriculum vitae*. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a); *In re McAllen Med. Center, Inc.*, 275 S.W.3d at 463. Although the Hospital has focused its complaints in the context of alleged inadequacies in Dr. Koumjian's report, we have examined and addressed Dr. Koumjian's report and *curriculum vitae*, and find that he has adequately shown that he is qualified by knowledge, skill, experience, training, or education to opine on causation on the matter at issue.

To the extent we have addressed Dr. Koumjian's qualifications by knowledge, skill, experience, training, or education as presented within the four corners of his expert reports, we need not repeat them here. However, in addition to stating that his "practice of medicine involves the diagnosis and treatment of coronary artery disease, under the same or similar circumstances as in this case," Dr. Koumjian also notes his familiarity with the standard of care for the prevention of death under the same or similar circumstances as those of Oscar.

Dr. Koumjian's qualifications to opine on the standards of care, breach of those standards, and causation arising from such breach with regard to the claims in this case are evident within the four corners of his expert report and *curriculum vitae*. *See Palacios*, 46 S.W.3d at 878. Consequently, because Dr. Koumjian's expert report shows that he is a physician having knowledge and experience concerning the subject of his opinion, we conclude the trial court did not abuse its discretion in determining that Dr. Koumjian was qualified to offer an opinion on the applicable standards of care, breach of those standards, and the causation of Oscar's cardiac arrest and death. Issue Two is overruled.

## II. Expert Report on Causation

11

In Issue One, the Hospital challenges Dr. Koumjian's expert report regarding causation. Before proceeding with our analysis of the Hospital's causation complaint, we observe that at the conclusion of Issue Two, the Hospital complains that Dr. Koumjian's expert report is fatally deficient with respect to any direct liability claims against it, and contends the trial court abused its discretion when it failed to dismiss Maria's "direct liability claims." We address the Hospital's direct-liability complaint here because it challenges the sufficiency of Dr. Koumjian's expert report rather than his qualifications to opine which we addressed in Issue Two above.

As Maria correctly notes, her pleadings do not assert direct liability against the Hospital but instead allege, "At all relevant times, Defendants El Paso Specialty Hospital and El Paso Orthopaedic Surgery Group acted by and through its employees and agents and are vicariously liable for their negligent acts and omissions." Even if Maria had pleaded a direct liability theory at the time of the expert report, full development of all liability theories is not required at the expert report stage. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013). Rather, when an expert report adequately addressing at least one pleaded liability theory satisfies the statutory requirements, the trial court must not dismiss it. *Id.*

A plaintiff asserting a health care liability claim must serve each defendant with an expert report that includes "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damage claimed." TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(6); *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 141 (Tex. 2015); *Bustillos v. Rowley*, 225 S.W.3d 122, 130 (Tex.App.--El Paso 2005, pet. denied)(expert report need not include full statement of applicable standard of care and

12

how it was breached; fair summary must set out what care was expected, but not given)(citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 880 (Tex. 2001)). A court is required to grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6). TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(*l*); *Van Ness*, 461 S.W.3d at 141. A report is a good faith effort if it provides adequate information to inform the defendant of the specific conduct the plaintiff has called into question, provides a basis for the trial court to conclude that the claims have merit, and does not contain a material deficiency. *Van Ness*, 461 S.W.3d at 141-42.

The evidence in the expert report need not be the same evidence as if the merits of the claim are being litigated. *Palacios,* 46 S.W.3d at 879; *Tenet Hosps. Ltd. v. Barajas*, 451 S.W.3d 535, 540 (Tex.App.--El Paso 2014, no pet.). Rather, the expert's report can be informal and the information contained therein "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879; *Barajas*, 451 S.W.3d at 540. However, an expert must explain, based on facts set out in the report, how and why the breach caused the injury. *Van Ness*, 461 S.W.3d at 142, *citing Jelinek v. Casas,* 328 S.W.3d 526, 539–40 (Tex. 2010). A bare expert opinion that the breach caused the injury will not suffice. *Van Ness*, 461 S.W.3d at 142.

*Analysis*

Dr. Koumjian set out the following facts in his report as those on which he based his opinions. Oscar's cardiologist, Dr. Gregorio J. Castillo, examined him on October 29, 2012. Dr. Castillo noted that Oscar was scheduled for surgery the following week, that his blood sugars

13

were elevated after increasing the dose of medication, that his blood pressure was 110/70, and his pulse was 63. Although Oscar had no symptoms of dizziness or syncope, Dr. Castillo observed that Oscar had uncontrolled diabetes and atherosclerotic cardiovascular disease. Dr. Castillo noted that Oscar did not have a medical contraindication for surgery under general anesthesia for treatment of his right shoulder adhesive capsulitis, but indicated that Oscar would require close monitoring because of his history of coronary artery disease.

On November 9, 2012, Oscar went to El Paso Specialty Hospital for a right shoulder therapeutic manipulation under general anesthesia and an injection of anesthetic, steroid, and arthrogram. Dr. Scott Protzman, an orthopaedic surgeon, and Nurse Anesthetist Fred Utter performed the orthopaedic procedure. Oscar's pre-anesthesia blood pressure was 128/90, and his heart rate was 84. The anesthesia was started at 9:05 a.m., and the procedure was commenced at 9:21 a.m. The procedure ended at 9:30 a.m., and Oscar was in the recovery room at 9:42 a.m. At that time, his heart rate was 82, and his respirations were 18. Anesthesia was ended eight minutes later at 9:50 a.m.

In the recovery room, Oscar complained of increasing pain. He subsequently underwent a block for post-operative pain, with anesthesia commending at 11:20 a.m. and ending at 11:45 a.m. Dr. Koumjian's expert report does not identify the person who administered this anesthesia to Oscar. In the recovery room, Oscar's blood pressure was 163/91, and his heart rate had increased to 91. Oscar told the recovery room nurse that he was feeling dizzy and very sleepy. The nurse informed Oscar that his symptoms were normal, and noted to Oscar and Maria that although Oscar's blood pressure was high, that was normal as well. The unidentified recovery room nurse

14

did not notify a physician about Oscar's reported symptoms, and at approximately 12:50 p.m., "the nurse" instructed Oscar and Maria to return home.

As instructed, Oscar and Maria returned home. Maria assisted Oscar out of their car and into their home, and at approximately 2 p.m., Maria left to run errands. When Maria returned home, she found Oscar unresponsive and called 9-1-1. Emergency medical services arrived at 4:30 p.m., initiated cardio-pulmonary resuscitation on Oscar, and transported him to a hospital, arriving there at 4:47 p.m. Cardio-pulmonary resuscitation was discontinued at 4:59 p.m., and Oscar was pronounced dead. An autopsy report shows that Oscar died from severe coronary atherosclerosis, and the certificate of death identifies Oscar's immediate cause of death was severe coronary artery disease.

In his report, Dr. Koumjian explains that Oscar was at risk for death due to severe coronary artery disease which the Hospital's nursing staff knew or should have known as Oscar had a diagnosis of atherosclerotic disease, coronary artery stents, uncontrolled diabetes, and hypertension, all of which Dr. Koumjian states are well-known risk factors for heart failure and ventricular tachycardia "which could lead to cardiac arrest if not promptly diagnosed and treated." According to Dr. Koumjian, ventricular tachycardia is a fast heart rhythm that starts in the ventricles of the lower part of the heart, and records show that Oscar, more likely than not, developed post-procedure ventricular tachycardia. At that time, Oscar experienced a significant change of blood pressure, an elevated heart rate and dizziness, which are signs and symptoms of ventricular tachycardia "which if not treated could lead to cardiac arrest." Dr. Koumjian explains that under the appropriate standard of care, a STAT cardiac workup, including an EKG, would have shown ventricular tachycardia, which in turn would have required immediate treatment in the

15

form of defibrillation, intubation, and mechanical ventilation. According to Dr. Koumjian, the performance of these measures more likely than not would have prevented Oscar's cardiac arrest.

The Hospital complains that the expert report presents a conclusory assertion of causation, and notes that in order to satisfy the causation element, an expert's report "must provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury." *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002); *Tenet Hosps., Ltd. v. Garcia*, 462 S.W.3d 299, 304 (Tex.App.--El Paso 2015, no pet.). This is the first purpose of a good-faith effort to provide a fair summary of the expert's opinion. *See Palacios*, 46 S.W.3d at 878-79. The Hospital contends that Dr. Koumjian's use of the term "could" in the sentence, "These were signs and symptoms of ventricular tachycardia which if not treated could lead to cardiac arrest," suggests that sometimes ventricular tachycardia does not lead to cardiac arrest, and argues that he should have provided explanations of whether the condition had resolved itself before the cardiac arrest, whether cycles of tachycardia may be followed by periods of regular heart rhythm, why Oscar's tachycardia was not well-tolerated, and how it led to arrest in the hours immediately following Oscar's discharge from the hospital. It also contends that Dr. Koumjian's opinion as to causation is deficient because he fails to explain why he believed timely treatment of Oscar as a patient at risk for cardiac arrest would have been successful. The Hospital argues that the report requires that the trial court infer that the ventricular tachycardia led to Oscar's cardiac arrest. *See Palacios*, 46 S.W.3d at 878-79. It also rightfully acknowledges that the second purpose of a good faith effort to provide a fair summary of the expert's opinion requires that the report provide the trial court with enough information to evaluate whether a case has merit and also acknowledges that given the temporal proximity of Oscar's tachycardia symptoms while at the

16

hospital and his cardiac arrest several hours later, it may be very reasonable, but improper, to infer that "the condition" did lead to Oscar's cardiac arrest.

We disagree with the Hospital's contentions regarding the adequacy of Dr. Koumjian's causation analysis. Again, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *Palacios*, 46 S.W.3d at 879.

Dr. Koumjian's expert report explains that the breach of the standards or care for monitoring Oscar as an at-risk cardiac patient for the signs and symptoms of tachycardia, which Dr. Koumjian explained can lead to cardiac arrest if untreated. He further explains that had the standard of care been adhered to by performing a STAT cardiac workup and immediate treatment with defibrillation, intubation, and mechanical ventilation, more likely than not, Oscar's cardiac arrest would have been prevented, but it was not.

We do not find the temporal proximity of the signs and symptoms of the tachycardia and Oscar's cardiac arrest that occurred mere hours, or less, after discharge to require the trial court to make an improper inference as to causation. These facts differ significantly from those in *Tenet Hosps. Ltd. v. Bernal*, 482 S.W.3d 165, 175 (Tex.App.--El Paso 2015, no pet.), in which we concluded the expert report did not adequately explain how conditions arising in a surgery two and one-half months prior to death caused the patient's death, and differ from those in *Clapp v. Perez*, 394 S.W.3d 254 (Tex.App.--El Paso 2012, no pet.), in which we concluded that the expert report failed to adequately link death to a failure to insert a naso-gastric tube during a procedure performed two weeks earlier. Rather, we conclude the close proximity between the onset of

17

Oscar's tachycardia signs and symptoms, the improper monitoring, diagnosis, and treatment of those signs and symptoms, the discharge of Oscar from the hospital despite the existence of those signs and symptoms, and the event of Oscar's cardiac arrest within hours after being told his symptoms were normal and being sent home supports the trial court's determination that Dr. Koumjian's expert report is adequate as to causation.

Because this expert report properly informs the Hospital of the specific conduct Maria has called into question, and provides a basis for the trial court to conclude that her claims have merit, it represents a good faith effort to provide a fair summary of Dr. Koumjian's opinions on the elements identified in the statute. *Palacios*, 46 S.W.3d at 878. Because the trial court acted within its discretion in determining that Dr. Koumjian's expert report was not conclusory but represented a good-faith effort to comply with the Medical Liability Act, Issue One is overruled.

## CONCLUSION

The trial court's order is affirmed.


August 24, 2016

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.