

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-24-00338-CV

---

Lynda Michelle Gonzalez, Individually, on Behalf of All Wrongful Death Beneficiaries, and as Personal Representative of the Estate of Donna H. Voldahl, deceased, Appellant

v.

Augustine O. Eleje, M.D.; Augustine O. Eleje, M.D., P.A.;
Antonio Morales Ortega, M.D.; Antonio M. Ortega, M.D., P.A.;
and Haroutioun S. Shahinian, M.D., Appellees

---

On Appeal from the County Court at Law No. 6
El Paso, Texas
Trial Court No. 2012-DCV04105

---

# **OPINION**

Appellant Lynda Michelle Gonzalez[1] appeals from a take-nothing judgment in a medical malpractice suit stemming from the death of her mother, Donna H. Voldahl. Gonzalez sued Augustine O. Eleje, M.D., Antonio Morales Ortega, M.D., and Haroutioun S. Shahinian, M.D.

---

[1] Individually, and on Behalf of All Wrongful Death Beneficiaries and as Personal Representative of the Estate of Donna H. Voldahl.

(collectively Appellees),[2] alleging they failed to "properly perform the medical diagnosis and treatment necessary . . . according to the standards set by the medical profession" for the post-operative care of Voldahl. On appeal, Gonzalez challenges the trial court's exclusion of her sole expert's testimony. We reverse and remand for a new trial.

## I. BACKGROUND

### A. April 28th to May 7th hospitalization

On April 28 and May 19, 2010, Voldahl was hospitalized under the care of Eleje (an internal medicine physician), Ortega (an infectious disease specialist), and Shahinian (a hematologist and oncologist). On April 28, Voldahl was admitted by Eleje at Del Sol Medical Center for gallstones and acute cholecystitis[3] that required surgery. At the time, Voldahl had stage 5 end-stage kidney disease, COPD, congestive heart failure, and other physical ailments. After Eleje consulted with David Lara, M.D., Lara removed Voldahl's gallbladder on May 1.

Voldahl remained in the hospital under Eleje's care until he discharged her on May 7. But Voldahl's abdominal pain persisted, and she exhibited symptoms of an infection. Eleje ordered intravenous antibiotics and testing and consulted with Ortega and Shahinian. Ortega changed Voldahl's antibiotic medication after a CT scan revealed pneumonia and Shahinian treated Voldahl's thrombocytopenia[4] with platelet transfusions. Voldahl's CT scan also revealed "some inflammatory reaction" in her gallbladder fossa but there was no organ perforation or abscess to indicate an infection. Voldahl's blood cultures also showed no sign of infection. By May 6, Voldahl

---

[2] Gonzalez also sued two professional associations, Augustine O. Eleje, M.D., P.A. and Antonio M. Ortega, M.D., P.A., under the doctrine of respondeat superior.

[3] Gonzalez's expert Samir Awad, M.D. defined cholecystitis is a condition where a gallbladder is inflamed or has an infection.

[4] Awad defined thrombocytopenia as a low blood platelets count.

had no fever and although her white blood cell count was elevated, she was improving. Eleje discharged Voldahl the following day and did not prescribe further antibiotics. Gonzalez's expert Samir Awad, M.D. testified, without objection, that Voldahl's elevated blood count at the time of discharge was due to an ongoing infection.

**B. May 19 to May 24 hospitalization**

Voldahl returned to Del Sol Medical Center on May 19 complaining of stomach cramping and was admitted by Eleje. After consulting with Ortega and Shahinian, Eleje ordered another CT scan of Voldahl's abdomen and pelvis. Although the scan did not reveal an infection, Ortega ordered another round of intravenous antibiotics to address any possible infection. Voldahl improved and Eleje discharged her on May 26 with a prescription for prednisone (steroid) and another for antibiotics. Shahinian increased the prednisone dosage from 20 milligrams to 60. Voldahl, however, did not take the prescribed antibiotics once she was home.

**C. May 31 to June 12 hospitalization**

Voldahl's stomach pain continued and Eleje admitted her at Providence Hospital on May 31. Eleje once again consulted with Ortega and Shahinian and ordered another CT scan. The scan revealed an abscess in Voldahl's abdomen and Eleje called Lara for a surgical consult. Lara performed a drainage procedure the following day. Two days later, a CT scan revealed that fluid collection had returned. Lara then performed an exploratory laparotomy on June 6 to identify and resolve the source of the abscess. Lara's postoperative notes indicated "[n]o signs of bile drainage and no sign of abscess in the gallbladder fossa." His notes stated he "then focused [his] attention on the transverse colon and there was an abscess and fibrinous tissues around the area of [sic] very indurated and inflamed proximal transverse colon." According to Lara, "[i]t appeared that the etiology of the abscess in this area was a perforated diverticulitis with a localized right upper

3

quadrant abscess."[5] Lara repaired the perforation in Voldahl's colon but immediately after the surgery, Voldahl suffered respiratory failure and remained in the ICU. She later continued her recovery on the general medical floor for several days. On June 12, Voldahl experienced respiratory distress and hypotension. Voldahl passed away that night after her family made the decision to withdraw life support.

Voldahl's death certificate identified several causes of death, including intra-abdominal abscess. Eleje agreed that "the abscess was the ultimate straw that [broke] the camel's back to cause her death."

### D. Awad's testimony on the standard of care and causation

In her petition, Gonzalez alleged each of the Appellees provided medical care, advice, and treatment to Voldahl for an intra-abdominal infection and sepsis. Gonzalez alleged Appellees violated their duty of care to exercise the care, skill, and diligence ordinarily possessed and used by other members of the medical profession in good standing under the same or similar circumstances, and that each was negligent in failing to properly perform the medical treatment and diagnosis necessary to Voldahl's welfare according to the standards set by the medical profession.

At trial, Gonzalez called Awad as an expert on the standard of care applicable to Eleje, Ortega, and Shahinian, and on causation. After Awad's testimony, all three Appellees objected on the grounds that (1) Awad was not qualified to opine on the standard of care as to each of them, and (2) Awad's proposed causation opinion was speculative. Awad was questioned outside the presence of the jury, and the trial court ultimately sustained the objections, stating: "I'm going to

---

[5] Awad defined diverticulitis as "inflammation of the colon as a result of the diverticulum."

sustain both objections as to the standard of care. And on the causation, I think terms like, could be related, the fact that it was speculation, I think, justifies my ruling. Objections are sustained."

Gonzalez then presented an offer of proof, which included reading from a written statement and submitting Awad's resume, expert report, related documents, and his deposition transcript with exhibits. Each Appellee moved for a directed verdict, arguing that Gonzalez had failed to establish her claim of medical negligence with physician expert testimony. The trial court granted the motions and later signed a final, take-nothing judgment in favor of Appellees. After Gonzalez's motion for new trial was overruled by operation of law, this appeal followed.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

"We review a trial court's decision to strike an expert for an abuse of discretion." *Johnson v. Harris*, 546 S.W.3d 293, 300 (Tex. App.—El Paso 2017, no pet.). "A trial court has broad discretion in determining whether expert testimony is admissible." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). We will not disturb the trial court's ruling absent a clear abuse of discretion. *Id.*; *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). A trial court abuses its discretion if it acted without reference to any guiding rules or principles. *Medlin v. King*, 705 S.W.3d 267, 287 (Tex. App.—El Paso 2024, pet. denied).

In a lawsuit against a physician for a patient's injury or death, only a physician can serve as an expert witness on whether the defendant departed from accepted medical standards if that physician:

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

5

Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a). For purposes of this section, "'practicing medicine' or 'medical practice' includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians." *Id.* § 74.401(b). In determining whether a person is qualified based on training or experience, courts consider whether the person, at the time the claim arose or at the time the testimony was given, "(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c). And "in determining whether an expert is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care[,]" courts apply the criteria specified in § 74.401—specifically, subsections (a), (b), and (c). *Id.* § 74.401(d). As to causation, "a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." *Id.* § 74.403(a).

Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Rule of Evidence 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed." Tex. R. Evid. 703. The offering party bears the burden to prove the witness is qualified under Texas Rule of Evidence 702. *Broders*, 924 S.W.2d at 151.

Section 74.403(a) applies the rules of evidence to an expert's qualification, rather than to the substance of the expert's opinion. *See Tenet Hosps., Ltd. v. Garcia*, 462 S.W.3d 299, 306 (Tex. App.—El Paso 2015, no pet.).[6] "Certainly Tex. R. Evid. 702's requirement that the witness must be qualified by 'knowledge, skill, experience, training, or education' would apply." *Id.* "We take the language in Section [74.403(a)] at face value that the reference to the Texas Rules of Evidence pertains to qualifications, and not to the opinion itself." *Id.*

### III. DISCUSSION

In a single issue, Gonzalez challenges the trial court's exclusion of her sole expert witness.[7] According to Gonzalez, the trial court's exclusion prevented her from proving key elements of her claim—specifically the standard of care and causation against each Appellee physician—and constitutes reversible error.

It is well established that a licensed physician is not automatically qualified to testify on every medical question. *Broders*, 924 S.W.2d at 152. However, a medical expert need not share the defendant's specialty to be qualified. *See Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003) ("Although Dr. McGehee is not a neurologist, the record reflects that he had experience and expertise regarding the specific causes and effects of Courtnie's injuries. Therefore, we agree with the court of appeals that the trial court did not abuse its discretion in admitting his testimony on matters pertaining to Courtnie's neurological injuries."); *Broders*, 924 S.W.2d at 153 (rejecting notion "that only a neurosurgeon can testify about the cause in fact of

---

[6] The *Garcia* court evaluated an expert's qualifications when reviewing an expert report under § 74.351(r)(5)(C) of the Texas Civil Practice & Remedies Code. That section defines an expert in terms similar to § 74.403(a). Under § 74.351(r)(5)(C), an expert is "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence" when giving opinion testimony about the causal link between the claimed injury, harm, or damages and the alleged departure from the applicable standard of care in a health care liability claim.

[7] Due to the overlap of Gonzalez's issues, we consolidate them into a single issue.

death from an injury to the brain, or even that an emergency room physician could never so testify"). Instead, the offering party is required to establish that the expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Id*.

The trial court must ensure that one who purports to be an expert truly has expertise concerning the actual subject about which they are offering an opinion. *Palafox v. Silvey*, 247 S.W.3d 310, 316 (Tex. App.—El Paso 2007, no pet.); *see also Ponder v. Texarkana Mem'l Hosp., Inc.*, 840 S.W.2d 476, 478 (Tex. App.—Houston [14th Dist.] 1991, writ denied) ("It would be nonsensical to permit physicians to testify about the causes of brain damage, yet prevent testimony by the very people who teach the physicians."). Thus, a "medical expert from one specialty may be qualified to testify if he has practical knowledge of what is traditionally done by medical experts of a different specialty under circumstances similar to those at issue in the case." *El Paso Specialty Hosp. Ltd. v. Gurrola*, 510 S.W.3d 655, 659 (Tex. App.—El Paso 2016, no pet.); *see also Ponder*, 840 S.W.2d at 477–78 (non-physician holding doctorate in neuroscience—who researched neurological injuries and taught neurophysiology, neuroanatomy, and neurochemistry to M.D.s and Ph.D.s—was qualified as a medical expert on the cause of brain damage). Furthermore, "[i]f the subject matter is common to and equally recognized and developed in all fields of practice, any practitioner familiar with the subject may testify as to the standard of care." *Gurrola*, 510 S.W.3d at 659; *see also Broders*, 924 S.W.2d at 154 ("And when a party can show that a subject is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields.").

**A. Awad's qualifications, experience, and training.**[8]

Awad testified that he is the Professor of Surgery at Baylor College of Medicine, Vice-Chair for Surgical Quality and Safety for the Department of Surgery at Baylor College of Medicine, and the Chief of Surgery at the Michael E. DeBakey Veteran's Affairs Medical Center of Baylor College of Medicine. He obtained his medical degree from Thomas Jefferson University and completed a general surgery residency at the University of Michigan, which consisted of five years of clinical work and two years of fellowship. Awad completed additional fellowship training in surgical critical care, acute care surgery, and trauma care, and also did clinical research during his fellowship.

When asked if all general or trauma surgeons have critical care training, Awad replied that they do not, explaining:

> We all get some critical care training during our general surgery residency, but you need to spend additional time to become a surgical intensivist. You need to do the dedicated fellowship and then sit for your board examination to become board certified and [obtain] privileges to practice in the ICU.

Awad further explained that he completed two additional years of training in an ACGME-accredited fellowship "where you learn to manage surgical patients in the intensive care unit, all aspects of their critical care . . . from head to toe." He primarily treated critically ill surgical patients. Awad testified that some arrived from the emergency room, and he stabilized them and treated underlying conditions such as severe sepsis, intra-abdominal sepsis, and intra-abdominal infections. He stated that he treated patients as a whole, addressing infectious diseases when present, and also responded to emergency calls and treated patients requiring emergency surgery.

Awad then began his career at Baylor College of Medicine in 2000 as an assistant professor and has remained there since. Over the last 24 years, he advanced through the ranks to become a

---

[8] Additional testimony by Awad about his experience is included later in the analysis relevant to each Appellee.

Professor of Surgery through clinical work as a surgeon and ICU intensivist, research, and residency instruction. When asked specifically about this case and his familiarity with an inflamed and infected gallbladder, Awad testified that he has been consulted hundreds, if not thousands, of times on patients with cholecystitis or gallbladder inflammation.

Awad also reviewed Voldahl's medical records and testified about them. Eleje was assigned to Voldahl upon her admission from the emergency room and explained that when Voldahl arrived,

> they needed to find an attending physician[9] that will accept and manage her, accept her medical care while she's in the hospital. And that person is responsible for the management of all her medical care. And, typically, they are internal medicine trained to be able to, again, deal with all aspects of her medical condition.

Because Voldahl's tests showed a possible post-surgery infection, Ortega examined her and prescribed antibiotics. Eleje started her on prednisone for thrombocytopenia.[10]

During Voldahl's second hospitalization, Shahinian increased the prednisone dosage from 20 milligrams to 60. Awad explained the increase was

> not the standard of care . . . in somebody that has a suspected or proven intra-abdominal infection and has signs and symptoms of sepsis.
>
> Giving those steroids is detrimental because it can mask the body's response to that ongoing infection. And increasing it without having a specific diagnosis for treatment is not the standard with regard to the management of patients with intra-abdominal infection and intra-abdominal sepsis. There was a working diagnosis at the time of it. The antibodies were sent. And the antibodies subsequently returned positive heparin induced thrombocytopenia.
>
> And the treatment for heparin induced thrombocytopenia is not increasing steroids. That was only a cover and another condition on the differential, it's an appropriate differential, obviously, made by an expert in hematology, but that doesn't rise to the top.

---

[9] Awad defined an "attending physician" as "the physician that is on tour to accept patients for admission . . . on to their service. So they attend to the patients." He later explained, "[t]he attending doctor in the hospital would take the patients, admit them and then care for them based on what their admission diagnosis and/or workup that's required."

[10] Awad defined thrombocytopenia as low blood platelets.

Awad testified that in his opinion, when Voldahl was discharged on May 26, she had intra-abdominal sepsis.

Awad was asked if he had experience with patients similar to Voldahl—patients he treated postoperatively after gallbladder removal, which involved collaboration with an infectious disease specialist and an internal medicine attending. Awad responded that as an attending physician, he usually admitted patients and provided full care based on his ICU training and experience. He added that he did not request routine infectious disease or internal medicine consults unless the case exceeded his expertise. For intra-abdominal infections, he stated he typically managed them himself unless the condition was obscure, in which case he consulted an infectious disease specialist.

Awad testified about the postoperative standard of care for laparoscopic cholecystectomy under circumstances like Voldahl's. He confirmed his familiarity with the standard of care, "specifically, as it relates to any type of infection related to the surgery." When asked about the "common core of training" doctors receive, Awad explained:

> So the common core of medical information is gained in medical school. And then further information is learned and gained in your training. And internal medicine doctors rotate through surgery, anesthesia, depending on their training program. And so they get some additional knowledge with regards to the surgical patients and the postop patients.

> Specially, when you train for critical care medicine, even if you come from internal medicine or anesthesia to do your critical care training, you all learn how to take care of the surgical patients in postop complications, should they have any need to go to ICU. So all of us, even though we train in different specialties from different branches, we learn the same medicine. And it's very extensive training and a lot of information that encompasses a lot of the internal medicine -- when they learn in internal medicine.

Awad also explained the circumstances when he was asked to consult:

> Again, for the admitted patients, typically, the hospitalists would -- if they're on a hospitalist service and they're the attending physician and they feel that their

11

patients have abdominal pain and/or surgical problem, they will consult me as a general surgeon to evaluate them.

If they're being admitted on the hematology/oncology service and they have a surgical problem, they would consult me.

If they're being admitted on the infectious disease service, they would consult me. It all depends.

And then we also get consults from the emergency room when patients present to the emergency room physician and they may have a surgical problem.

### B.  Awad was qualified to opine regarding Eleje's standard of care.

Awad stated that the "most likely cause [of Voldahl's infection] was something related to her surgery that was a few days before her [May 7] discharge, her cholecystectomy." He testified that if a surgeon had been called,

> the surgeon would have examined her abdomen, . . . would have potentially obtained a CAT scan with contrast[,] [a]nd based on those findings, would have taken her to the operating room for a second look to determine if the cause of her abdominal pain and the increased white blood cell count was the result of something that occurred during the surgery.

When asked about the applicable standard of care for discharging a patient under circumstances similar to Voldahl's, Eleje objected to Awad's testimony on the standard of care for an attending physician like Eleje and on causation, which the trial court sustained.

Regarding the second hospitalization, Awad testified that tests showed Voldahl's "infection [was] worse because there's now even more elevation of the white [blood cell] count with the neutrophilia, which is specific for active, ongoing infection." He stated her CT scan with contrast "suggest[ed] that there was something going on with that colon wall from the inflammation, most likely a perforation in that area." Awad testified that at discharge on May 26, no surgeon was consulted, even though her "white [blood cell] count was elevated and the chart documented her diagnosis as intra-abdominal sepsis." The trial court sustained objections to

12

Awad's responses when asked, "hypothetically, had a surgeon been consulted, what would have been the standard of care for a surgeon[.]"

Awad testified he was not board certified in internal medicine. And when asked whether he would defer to an internal medicine specialist in nonsurgical matters, he replied he would not "because [he could] take care of all medical aspects of the patient even though [he was] not board certified in internal medicine." Awad explained he was board certified in critical care, "which is even a [sic] higher level of care for the medical care of patients[,]" and he "utilize[s] that experience and expertise on surgical patients." He testified that if, as the attending physician in nonsurgical matters, he chose to consult an internal medicine physician, he would defer to that physician. However, he does not consult internal medicine physicians. Eleje then objected that Awad was not qualified to opine on the standard of care for an internal medicine specialist. As to causation, Eleje joined Ortega's objection The trial court sustained both objections.

On appeal, Eleje contends Awad could have testified that the standard of care is common to, and equally recognized, in Awad's surgical or critical care specialty and in Eleje's internal medicine specialty. Alternatively, Eleje asserts that Awad could have shown practical knowledge of what internal medicine physicians like Eleje commonly do when caring for patients under circumstances similar to Voldahl's. According to Eleje, Awad did neither. Eleje also contends that because Awad acknowledged he does not consult with internal medicine physicians when treating patients like Voldahl, he could not demonstrate practical knowledge of what internal medicine physicians do in similar circumstances. We disagree.

Awad is board certified in general surgery, surgical critical care, acute care surgery, and trauma. Awad's testimony and curriculum vitae show he has taught, spoken, and published on intra-abdominal sepsis and surgical-site infections. Over the last 24 years, he has advanced to

Professor of Surgery through his clinical work as a surgeon and ICU intensivist, has conducted research, and instructed residents on these matters. He also held relevant administrative leadership roles. He testified that he has operated on patients with chronic cholecystitis and is familiar with postoperative complications associated from cholecystectomy.[11] Awad explained that he is frequently "referred a lot of patients that have complications from their gallbladder surgery, very similar to this case where there was an inadvertent injury to the colon[,]" the duodenum, or common bile duct, which he described as "a lot more complicated" and required "major surgery." He has performed operations on patients with these conditions, managed their postoperative care, monitored them for symptoms, and ordered necessary studies and any follow-up procedures. Additionally, he treats patients admitted after cholecystectomy and emergency room patients with similar complications when on acute care surgery call.

We conclude Awad demonstrated that when he testified, he was practicing medicine, had knowledge of accepted standards of medical care for diagnosing, treating, and caring for patients under circumstances similar to Voldahl's, and was qualified by his training and experience to opine on those standards. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a). Awad was not required to be board-certified in internal medicine and sufficiently showed he had substantial training and experience in that field and was actively providing medical care services relevant to Voldahl's case. *Id.* § 74.401(c). The trial court erred by sustaining Eleje's objection to Awad's qualification on the standard of care for an internal medicine specialist like Eleje.

### C. Awad was qualified to opine on Shahinian's standard of care.

Awad testified he is not a hematologist nor board-certified in hematology. When asked if he was an oncologist, he clarified that he is a surgical oncologist and presents himself as an expert

---

[11] Awad said a cholecystectomy is the removal of the gallbladder.

in surgical oncology, not medical oncology. When asked whether he would involve a hematologist in managing a complex case of immune thrombocytopenia, he answered, "in part."

Awad agreed his "one and only criticism of Dr. Shahinian is that he increased the dosage of prednisone from 20 milligrams to 60 milligrams," which he explained masked Voldahl's inflammatory signs and symptoms, such as fever. He testified he could not say with reasonable probability that the outcome in this case would have been different had Voldahl not been prescribed prednisone. He also stated he could not speculate that the increased prednisone dose is what caused her death. Awad explained that in reasonable medical probability, he could not say "that her treatment would have been a dollar more, a dollar less or in any way different between the fact that she was given steroids or if she had not been given steroids[.]"

Shahinian objected that Awad was not qualified to opine on the standard of care for a board-certified hematologist and could not testify about the effect of steroids in this case or whether they caused Voldahl's death. The trial court ruled as follows:

> If it's outside his area of expertise, then . . . it's not coming in. And so I think that, for example, Dr. Shahinian, I mean, he's board certified, etc. So, no, I'm not going to allow [Awad] to opine on causation or standard of care in those areas.

On appeal, Shahinian contends the trial court reasonably determined Awad was not qualified because he lacks board certification in hematology and failed to show "other substantial training or experience in an area of medical practice relevant to the claim" or that he was actively practicing medicine in providing care relevant to the claim against Shahinian. Shahinian also asserts Awad's testimony—that he typically seeks a hematology consult and defers to those physicians—supports the trial court's conclusion that Awad is not qualified to opine on thrombocytopenia issues of a patient situated similarly to Voldahl. We disagree.

15

Awad testified he regularly prescribes steroids in the ICU for conditions such as severe sepsis or septic shock, but only as a "last resort." He stated he understands and was familiar with the effects of prednisone on patients with infections and stated that "giving additional steroids can mask the signs and symptoms of that infectious process." For example, he explained that a patient may not develop a fever despite having an infection and that steroids—especially at the higher doses—can suppress the immune response. Awad added that "there is an impact of steroids on the immune system and if somebody that has [an] active infection, it can aggravate or diminish the necessary response to fight that infection."

He described the increase of Voldahl's prednisone "from 20 to 60 mg" as "a very high dose[.]" When asked how this dose would have affected Voldahl, the trial court sustained Shahinian's objection that this testimony went to causation. Awad also testified that published reports generally show that "giving oral corticosteroids in high doses in patients who have an infection can lead to poor outcomes."

We conclude Awad demonstrated that when he testified, he was practicing medicine, had knowledge of accepted standards of medical care for diagnosing, treating, and caring for patients under circumstances similar to Voldahl's, and was qualified by training and experience to give an expert opinion on those standards. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a). Though not a hematologist or board-certified in hematology, which he was not required to be, Awad showed he had substantial training and experience in that field and was actively providing relevant medical care. *See id.* § 74.401(c). The trial court erred by sustaining Shahinian's objection to Awad's qualification to testify on the standard of care for a physician administering steroids, such as Shahinian.

### D. Awad was qualified to opine on Ortega's standard of care.

Awad testified he is not board certified in infectious disease but stated he was qualified and trained in managing all types of surgical infections as they relate to a patient's care. He was then questioned as follows:

> Q. In matters of diagnosis and management, nonsurgically, of a patient, where an infectious disease specialist has been called in to the case by the attending physician, would you defer to the expertise of the infectious disease physician in matters within his discipline?
>
> A. If an attending calls an infectious disease expert, I would defer and they would take the information from the infectious disease specialist and determine what to do with that information, yes.

Awad agreed he could not and would not speculate on when Voldahl developed an intra-abdominal abscess or when any perforation or injury to the transverse colon occurred. He said he could "speculate why it occurred, but [not] when[.]" He also agreed he could not and would not speculate on whether Voldahl's chance of survival during any hospitalization was above or below 50%.

Ortega objected that Awad lacked the qualifications to testify to the standard of care for an infectious disease physician. Awad's counsel responded that contrary to Ortega's characterization of the case as "nonsurgical," it involved a postoperative abdominal infection and Awad was "highly qualified to testify as to the management of a potential or obvious postoperative complication in that regard." Awad's counsel noted Awad had "already talked about his experience with cholecystectomies, the risk associated with infection, a risk of injury of the bowel and then also how he manages those patients when they do have intra-abdominal infections." The trial court sustained Ortega's objection. On appeal, Ortega contends no evidence showed that Awad had ever consulted or served as an infectious disease specialist or relied upon for infectious disease expertise, and Awad "essentially admitted that he was not qualified to second guess the medical decisions made by Dr. Ortega." We disagree.

17

Awad serves as both a surgeon and an ICU intensivist, spending a week at a time covering the entire 20-bed surgical ICU. He explained that the hospital's residency program provides "hands-on and in real-time training at the bedside, both in the emergency room, in the ICU and in the operating room." This training includes managing abdominal issues, such as suspected intra-abdominal infection, ordering studies, treating patients, and stabilizing them. Awad teaches residents basic medicine, postoperative care after gallbladder removal, and how to diagnose and treat suspected postoperative infections. His trainees include surgical residents, internal medicine residents, family practice residents rotating through surgery, and residents specializing in infectious disease.

Awad stated that when a surgical issue arises, he, "as a surgeon, in addition to doing all that, can take them to the operating room and take care of the surgical problem if it's an intra-abdominal infection or intra-abdominal sepsis." He added that intensivists manage all body systems—"the GU system, the hematologic system, the GI system, all of it"—and call consultants only when a case exceeds their expertise.

Awad testified he is familiar with the postoperative standard of care after laparoscopic cholecystectomy under circumstances similar to Voldahl's, "specifically, as it relates to any type of infection related to the surgery." He is familiar with diagnosing such infections and initiating antibiotics. He explained he is "the one that approves antibiotic usage in the surgical intensive care unit for other surgeons to use because of [his] expertise in surgical infections and surgical infectious disease." Awad has conducted extensive sepsis research and published material on severe sepsis and multisystem organ dysfunction, including intra-abdominal infections and intra-abdominal sepsis. He has authored a supplement review on severe sepsis in the "American Journal of Surgery" and described it as a comprehensive resource summarizing all relevant literature.

18

Awad has also participated in multiple clinical trials and research on severe sepsis, focusing on complicated intra-abdominal infections.

Awad sufficiently showed that when he testified, he was practicing medicine, had knowledge of accepted standards of medical care for diagnosing, treating, and caring for patients under circumstances like Voldahl's, and was qualified by training and experience to opine on those standards. *See* Tex. Civ. Prac. & Rem. Code § 74.401(a). Though not board-certified in infectious diseases, Awad showed he had substantial training and experience in that field and was actively providing relevant medical care. *See id.* § 74.401(c). Accordingly, the trial court erred by sustaining Ortega's objection to Awad's qualification to testify about the standard of care for an infectious disease specialist like Ortega.

### E. Awad was qualified to testify on causation.

At trial, Shahinian objected that Awad was not qualified to testify about the effects of steroids in this case. Shahinian contends Awad lacked the qualifications to opine on whether Shahinian's sole alleged breach—prescribing a higher dose of prednisone for thrombocytopenia during the second hospitalization—was a proximate cause of Voldahl's injury or death.

At trial, Ortega objected as follows:

> Awad lacks the necessary qualifications to provide opinion testimony in this case beyond mere speculation as to whether any conduct of Dr. Ortega may have caused the damages of which the plaintiffs complain in this case, specifically, the death of Ms. Voldahl, as he can only speculate and will not speculate as to when any injury to the colon occurred, as to whether at any time the patient's chance of survival was above or below 50 percent, and as to when any abscess may have formed in this case.

Ortega argues Awad was not qualified to testify on causation because Awad's medical license and experience did not automatically qualify him an expert capable of stating that Ortega—an infectious disease physician consulted by the attending physician—caused Voldahl's death.

19

Eleje joined Ortega's objection on causation without elaborating on his own objection to Awad's testimony as it related to him. Eleje merely asserted, "the main breach of the standard of care is to call a surgeon and I join [Ortega's attorney] in his argument that, in that scenario, the appropriate expert to opine on whether a surgeon should be called back is by an internal medicine specialist." On this record, we conclude Awad was qualified as an expert by knowledge, skill, experience, training, and education to opine on causation. *See* Tex. R. Evid. 702; Tex. Civ. Prac. & Rem. Code Ann. § 74.403(a).

**(1) Awad's causation testimony was not purely speculative or unreliable.**

Eleje argues, for the first time on appeal, that the trial court properly excluded Awad's causation testimony because it was speculative and unreliable.[12] Eleje claims Awad admitted that his opinion relied on an unsupported assumption—that Voldahl's colon was perforated and an abscess was present during her first or second hospitalization. According to Eleje, because Awad acknowledged that his assumptions lacked reliability, the trial court acted within its discretion in finding Awad's causation opinion unreliable.

But Eleje did not raise this objection in the trial court and cannot do so for the first time on appeal. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) ("when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis"); *In re Commitment of Ausbie*, No. 14-18-00167-CV, 2021 WL 1972407, at *7 (Tex. App.—Houston [14th Dist.] May 18, 2021, pet. denied) (mem. op.) ("[Appellant] did not object in the trial court to [the State's expert witnesses]'s expert testimony specifically challenging the reliability of their foundational data. He cannot do so for

---

[12] To the extent Ortega or Shahinian also argue Awad's testimony was speculative, we consider that here.

the first time on appeal."); *Dallas Cnty. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 55 (Tex. App.—Dallas 2012, pet. denied) ("when a scientific opinion is not conclusory but the basis for the expert's opinion is unreliable, an objection at trial is necessary 'to give the proponent a fair opportunity to cure any deficit and thus prevent trial by ambush.'"). As to Eleje's argument that Awad's testimony is speculative, a challenge to an expert's opinion as speculative may be raised for the first time on appeal. *In re Commitment of King*, 657 S.W.3d 16, 26 (Tex. App.—El Paso 2022, pet. denied). We therefore address only whether Awad's causation testimony was speculative.

Awad agreed he could not and would not speculate on the "exact timing" of when Voldahl may have developed an intra-abdominal abscess. He also stated that although he could speculate about why a perforation or injury to the transverse colon may have occurred, he could not and would not speculate about when any perforation or injury occurred. However, when asked about the cause of the infection, Awad testified:

> Q. Let me ask you specifically what her lab values were and then we'll take it to the next step. Go ahead. What were her lab values at the time of her discharge from the first hospitalization?
>
> A. Right. From the first hospitalization . . . [h]er white blood cell count, 13,000 with 80 percent neutrophils.
>
> Q. What's the significance of that?
>
> A. That there is an ongoing infection at the time of discharge.
>
> Q. Have you treated infections before under these circumstances?
>
> A. I've treated many postoperative infections, yes.
>
> .    .    .
>
> Q. So the first question is, do you have an opinion as to what were the possible, probable causes of the infection postoperatively and the elevated white count with neutrophils that you just discussed?
>
> A. Yes, I have an opinion. That's the differential, but it's more likely than not related to her surgery that she just had.

21

Q. And we established earlier that infection is just one of the risks associated with such a surgery, correct?

A. Yes.

Q. And then the fact that there was -- there was nothing indicated that there was a complication in the operative note. Does that eliminate the risk and the eventual event of a postoperative infection?

A. No.

Q. Now, once the infection was still present -- and that's based on laboratory values, correct?

A. And her exam during that first hospitalization.

Awad described post-surgery CT scan findings as follows:

A. Because she was complaining of persistent abdominal pain and the fact that she had a persistent [leukocytosis], elevated white blood cell count. That's why the CT scan was obtained.

Q. From a layman's perspective, what is it that the doctor is hoping or looking for? Why is that study relevant in determining the cause or the reason for those abnormal lab values?

A. So given the patient's complaint of pain and the persistent elevated white blood cell count, the reason for the CAT scan was to look for intra-abdominal source of that infection.

. . .

Q. Just using that uncontrasted CT scan, what did it show?

A. Exactly. Because it was an uncontrasted CT scan, it showed that there was a gastric obstruction and there was a mass in the head of the pancreas, with encasement surrounding the duodenum with an inflammatory reaction around the gallbladder fossa, which describes maybe inflammatory or neoplastic arising from the head of the pancreas or duodenum.

. . .

Q. And then so what does all that mean in terms of looking for the etiology or the cause of this infection?

A. Well, it means that there was some inflammatory process going on and that you would need to investigate that further because this was a noncontrast CT.

. . .

Q. Now, had a surgeon been called, what would have been the applicable standard of care of the surgeon during that first hospital[ization]?

A. Had the surgeon been called, they would have reviewed the noncontrast CT scan. They would have thought what was going on with regards to her

22

abdominal pain and rise in white count could be related to the surgery and they would have investigated further.

Q. What type of potential investigation was within the reasonable care of a surgeon?

.  .  .

A. So the surgeon would have examined her abdomen, determined if she would have had peritoneal signs, would have potentially obtained a CAT scan with contrast. And based on those findings, would have taken her to the operating room for a second look to determine if the cause of her abdominal pain and the increased white blood cell count was the result of something that occurred during the surgery.

Awad also explained that complications from a bowel injury sustained during the cholecystectomy likely contributed to Voldahl's subsequent intra-abdominal sepsis:

Q. You've been speaking with [Gonzalez's attorney] about potential intraoperative complications that led to explain what occurred in this case, correct? A perforation or an inadvertent injury that you can't say when it happened, correct?

A. If it happened, it happened at the time of surgery. But, yes.

Q. On page 59 of your deposition[,] here is your answer to the question about whether there was any postoperative complications. . . . [Y]ou say this: There was intra-abdominal sepsis and part of the differential is it has to be related to the surgery and it has to be ruled out. . . . I'm not saying anything happened because I have no evidence except the pathology report at the end. You remember giving that testimony?

A. Yes, sir, because I wasn't there during the surgery. So, yes, that is correct. But the pathology at the end demonstrated that there was a perforation with abscess in the colon.

Q. Which you can't say when it occurred, correct?

A. That it's related to the surgery, so it probably started and occurred at the time of surgery.

Q. You already told us that you can't say when the perforation occurred, correct?

A. I can speculate as to what I think, but can I tell you the timing exactly? No.

Q. You'd only be guessing? That's what speculation means, right?

A. I would be using my medical experience in handling many of such cases of these types of cases and being referred and operating on people such as Ms. Voldahl. The fact is, it doesn't spontaneously occur in that region . . . So there had to be something that caused that perforation. And in her case, it started at surgery. There was something that occurred that led her to have intra-

abdominal -- you are not going to argue and say that she didn't have intra-abdominal infection and sepsis during the second hospitalization and then she was discharged to home with intra-abdominal sepsis and abnormal labs and abdominal pain and then presented back later in distress and died.

Awad also was asked about the increased steroid dosage and whether it would be speculative to opine on whether the increased dose at the time of discharge on May 26 would have made a difference. Awad testified:

So, again, going back to the second hospitalization where those steroids [were] increased. Number one, it is not the standard of care to increase steroid dosage in somebody that has a suspected or proven intra-abdominal infection and has signs and symptoms of sepsis. Giving those steroids is detrimental because it can mask the body's response to that ongoing infection. And increasing it without having a specific diagnosis for treatment is not the standard with regard to the management of patients with intra-abdominal infection and intra-abdominal sepsis. There was a working diagnosis at the time of it. The antibodies were sent. And the antibodies subsequently returned positive heparin induced thrombocytopenia. And the treatment for heparin induced thrombocytopenia is not increasing steroids. That was only a cover and another condition on the differential, it's an appropriate differential, obviously, made by an expert in hematology, but that doesn't rise to the top. The overarching, Your Honor, issue is the patient developed an intra-abdominal infection and sepsis very soon after a surgical procedure, which was on an intra-abdominal organ, on an organ in close proximity to two major structures, that, if there was an injury and they were to leak would cause that severe intra-abdominal sepsis. And, in addition, there was treatment rendered by the antibiotics during the second -- but they discharged the patient with the diagnosis in the discharge summary of intra-abdominal -- ongoing intra-abdominal infection with an elevated white count with neutrophilia.

As our sister courts have stated, "[w]eaknesses in the facts underlying an expert's opinion generally go to the testimony's weight rather than its admissibility, and an opinion is no evidence only if it is based completely on speculation and surmise." *Creech v. Columbia Med. Ctr. of Las Colinas Subsidiary, L.P.*, 411 S.W.3d 1, 13 (Tex. App.—Dallas 2013, no pet.); *LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 478 (Tex. App.—Houston [1st Dist.]. 2007, pet. denied) ("The weakness of facts in support of an expert's opinion generally goes to the weight of the testimony rather than the admissibility."); *see also Wilson v. Shanti*, 333 S.W.3d 909, 915

24

(Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("Patient history may be part of a reliable basis for a treating-physician's causation opinion."); *White v. Scaff*, No. 13-10-00408-CV, 2012 WL 2608626, at *3 (Tex. App.—Corpus Christi July 5, 2012, pet. denied) (mem. op.) ("the admissibility of an expert opinion does not depend upon the expert disproving or discrediting every possible cause other than the one espoused by him"). We do not find that to be the case here. Awad's testimony on causation was not based entirely on speculation or surmise, and his assumption that the infection resulted from her surgery does not render his opinion incompetent speculation. He relied on his considerable experience and applied principles of differential diagnosis, "the basic method of internal medicine." *White*, 2012 WL 2608626, at *10. "Generally speaking, when properly conducted, the technique has important non-judicial uses, is generally accepted as valid by the medical community, and has been subjected to use, peer review, and testing." *Id.* The trial court erred by sustaining objections to Awad's testimony on the ground of speculation.

### E. The exclusion of Awad's testimony on standard of care and causation was reversible error.

After the trial court excluded Awad's testimony, each Appellee moved for a directed verdict, arguing Gonzalez failed to prove her negligence claim through expert physician testimony. The trial court granted the motions. On appeal, Gonzalez contends the exclusion of Awad's testimony was harmful error requiring reversal because his testimony was central to establishing both the standard of care and the causal link between Appellees' breaches and Voldahl's injuries and death. According to Gonzalez, Awad's testimony would have shown that Appellees' conduct led to undiagnosed and untreated postoperative sepsis, causing fatal complications. And without this evidence, the jury was deprived of the opportunity to consider whether the alleged breaches of the standard of care caused Voldahl's injuries and death. We agree.

25

**(1) The record contains sufficient evidence supporting Awad's causation testimony.**

We first address Appellees' argument that Gonzalez failed to provide an offer of proof sufficient to establish the substance of Awad's proposed causation testimony. Appellees argue that without such proof, this Court cannot determine whether excluding Awad's testimony was reversible error. According to Appellees, Gonzalez must demonstrate on appeal that the excluded evidence—Awad's opinions on standard of care and causation—was controlling on a material issue, was not cumulative, and its absence resulted in an improper judgment. Appellees concede Gonzalez satisfied the first two elements because Awad's testimony was material and not cumulative. As to the third element, they argue Gonzalez cannot show that excluding Awad's testimony resulted in an improper judgment. Appellees claim that the record does not contain evidence supporting Awad's assumption that Voldahl had a perforation, abdominal abscess, or any other condition requiring surgical treatment during her first or second hospitalizations. We disagree that the record contains no evidence supporting Awad's assumptions.[13]

When a party presents an expert witness who relies on assumed facts, the party must provide some proof of the material assumptions. *Hous. Auth. of City of El Paso v. Beltran Elec. Contractors, Inc.*, 550 S.W.3d 707, 714 (Tex. App.—El Paso 2018, pet. denied). However, "an expert's factual assumptions need not be uncontested, or established as a matter of law." *Id.* at 715. "A fact finder would necessarily decide if the facts support a contested assumption." *Id.*

The record supports Awad's assumptions that Voldahl's colon was perforated and that an abscess was present. Voldahl's discharge summary noted Lara found a perforated right colon.

---

[13] Eleje's argument relies, in part, on *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713 (Tex. 1998), for his assertion that without factual support in the record for Awad's assumption, the analytical gap in Awad's causation testimony is too great. *Gammill* dealt with the necessity of a trial court considering the methods, analysis, and principles relied upon by the expert in assessing the reliability of an expert's opinion. *See id.* at 725–28. We have already concluded that any challenge to Awad's opinion based on reliability was waived.

Lara's June 6 postoperative notes identified an abscess and fibrinous tissues around a "very indurated and inflamed proximal transverse colon." Lara stated "[i]t appeared that the etiology of the abscess in this area was a perforated diverticulitis with a localized right upper quadrant abscess."[14] Lara repaired the perforation and concluded the surgery.

Awad testified the gallbladder sits near several major organs, including the transverse colon junction. He testified that during gallbladder surgery, "you have to be able to push . . . the colon away and carefully free up the gallbladder from the colon without injuring it." He agreed an inadvertent colon injury could occur despite the surgeon's best efforts. Although Awad would not speculate on the exact timing of the perforation, he testified that an infection "doesn't spontaneously occur in that region[,]" "there had to be something that caused that perforation" and "in her case, it started at surgery." In his opinion, "[t]here was something that occurred that led her to have . . . intra-abdominal infection and sepsis during the second hospitalization[.]" Because we find the record contains evidence supporting Awad's assumptions that Voldahl's colon was perforated and that an abscess was present, the record is sufficient to determine whether the exclusion of his testimony was harmful. We now turn to that analysis.

**(2)   The exclusion of Awad's testimony caused an improper judgment.**

"To obtain reversal of a judgment based on error in the exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause 'the rendition of an improper judgment.'" *Sears, Roebuck & Co. v. Abell*, 157 S.W.3d 886, 897 (Tex. App.—El Paso 2005, pet. denied) (quoting Tex. R. App. P. 44.1(a)(1)). "[T]he complaining party is not required to prove that 'but for' the error, a different judgment

---

[14] Awad defined diverticulitis as "inflammation of the colon as a result of the diverticulum."

would necessarily have resulted." *Id.* "Instead, the complaining party must only show that the error 'probably' resulted in an improper judgment." *Id.*

The role excluded evidence plays in the context of a trial is important. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). "[T]he exclusion or admission is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Id.* "But if erroneously admitted or excluded evidence was crucial to a key issue, the error is likely harmful." *Id.* Accordingly, "[r]eversible error does not usually occur in connection with rulings on questions of evidence, unless the appellant can demonstrate that the whole case turns on the particular evidence admitted or excluded." *Sears, Roebuck*, 157 S.W.3d at 897; *see also Int. of C.C.O.*, 714 S.W.3d 198, 210 (Tex. App.—San Antonio 2024, no pet.) (same).

Awad's testimony was critical to the two key issues in the case—standard of care and causation. Gonzalez's case depended entirely on Awad's testimony; without it, there was no evidence on the appropriate standard of care for each Appellee, or on causation. *See Cent. Expressway Sign Assocs.*, 302 S.W.3d at 874 ("We believe the error was reversible because Wall's testimony was directly related to the central issue in the case, the value of the condemned property."). As explained above, any weaknesses in the facts underlying Awad's opinion affect its weight, not its admissibility. *Creech*, 411 S.W.3d at 13; *LMC Complete Auto.*, 229 S.W.3d at 478. As such, the trial court's error in excluding Awad's testimony resulted in an improper judgment. Gonzalez's sole issue is sustained.

## IV. CONCLUSION

The trial court abused its discretion in excluding Awad's testimony. Accordingly, we reverse the trial court's judgment and remand for a new trial.

MARIA SALAS MENDOZA, Chief Justice

January 9, 2026

Before Salas Mendoza C.J., Palafox, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), (sitting by assignment)